

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AUG 11 2003

SUSAN D. WIGENTON
U.S. MAG. JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | 03CR880 |
| HEMANT LAKHANI, a/k/a "Hemad Lakhani" | : | Mag. No. 03-7106 |

I, James J. Tareco, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### Count One

From in or about December, 2001, to on or about August 12, 2003, in the District of New Jersey and elsewhere, defendant HEMANT LAKHANI, a/k/a "Hemad Lakhani," did knowingly and willfully attempt to provide material support and resources, and to conceal and disguise the nature, location, source, and ownership of material support and resources, intending that they were to be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Sections 32, 2332a, and 2332b.

In violation of Title 18, United States Code, Sections 2339A and 2.

### Count Two

From in or about December, 2001, to on or about August 12, 2003, in the District of New Jersey and elsewhere, defendant HEMANT LAKHANI, a/k/a "Hemad Lakhani," did knowingly and willfully engage and attempt to engage in the business of brokering activities with respect to the import and transfer of a foreign defense article, namely a shoulder-fired surface-to-air-missile of foreign origin, which was a non-United States defense article of a nature described on the United States Munitions List, without having first registered with and obtained from the Department of State's Directorate of Defense Trade Controls a license for such brokering or written authorization for such brokering.

In violation of Title 22, United States Code, Section 2778(b)(1) and (c), Title 22, Code of Federal Regulations, Sections 121.1, 127.1(d), 129.3, 129.6 and 129.7, and Title 18, United States Code, Section 2.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached pages and made a part hereof.

James J. Tareco, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
August 11, 2003 in Essex County, New Jersey

HONORABLE SUSAN D. WIGENTON
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

I, James J. Tareco, a Special Agent of the Federal Bureau of Investigation, having conducted an investigation and having spoken with other individuals and reviewed reports, documents, and other material, have knowledge of the following facts:

1.  In or about December, 2001, an individual who was a cooperating witness under the direction of federal law enforcement officers (hereinafter "CW"), began to have conversations with defendant HEMANT LAKHANI, a/k/a "Hemad Lakhani." Many of the CW's conversations with defendant LAKHANI were audio tape recorded and several were audio and video tape recorded. From in or about December, 2001 to on or about August, 12, 2003, the CW and defendant LAKHANI had over 150 conversations that were recorded. The conversations between defendant LAKHANI and the CW were spoken primarily in the languages of Urdu and Hindi. Because this Affidavit is submitted for the limited purpose of establishing probable cause to believe that defendant LAKHANI committed violations of Title 18, United States Code, Section 2339A, and Title 22, United States Code, Section 2778(b)(1) and (c), not all facts and information from the investigation are included. The statements of defendant LAKHANI and others set forth in this Affidavit are set forth in substance and in part, and where the original conversations are not in English, the statements set forth herein represent English language translations.

2.  In an audio and video recorded meeting in New Jersey on or about January 17, 2002, defendant LAKHANI represented to the CW that he could supply the CW with various weapons, including anti-aircraft guns and missiles. The CW represented himself as someone interested in purchasing weapons, including anti-aircraft guns and missiles. In particular, the CW indicated that the people he represented, a Somali group, wanted to purchase one anti-aircraft missile initially with a purchase of a greater number of missiles to follow. Defendant LAKHANI, who is a British citizen residing in London, England, informed the CW that he deliberately did not bring with him a list of weapons he could obtain for fear that someone would open his baggage and find the list. Defendant LAKHANI and the CW discussed the risk involved in the potential arms sale and agreed that they should split the commission for arranging the sale. Also during this meeting, defendant LAKHANI and the CW discussed Usama bin Laden. Defendant LAKHANI stated, in substance and in part, that bin Laden "straightened them all out" and "did a good thing." During the meeting, defendant LAKHANI provided to the CW a military arms brochure and the business cards of three individuals from a

military production company where he stated he had connections.

3. In a recorded telephone conversation on or about January 23, 2002, defendant LAKHANI confirmed for the CW that "both items," i.e., the anti-aircraft missiles and the anti-aircraft guns, were available for purchase.

4. On or about April 25, 2002, defendant LAKHANI and the CW had an audio and video recorded meeting at a hotel in New Jersey. When the CW indicated that the buyer whom he represented wanted to purchase shoulder-fired missiles, defendant LAKHANI recommended certain models and described their capabilities. Defendant LAKHANI stated that he had traveled from London to New Jersey specifically to meet with the CW concerning this deal, indicating that "it can be done" and that he wanted the buyer whom the CW represented to know that he was "a serious businessman." When defendant LAKHANI asked who would "take them," i.e., who the buyer of the missiles was, the CW responded that the buyer wanted the missiles for a "jihad," "a plane," and "want[ed] to hit the people over here." Defendant LAKHANI also commented, "The Americans are bastards." When the CW remarked that "this is not a legal business," defendant LAKHANI confirmed his understanding of the illegal nature of the transaction. Defendant LAKHANI also discussed with the CW prior arms sales in which he had been involved. Toward the end of the meeting, defendant LAKHANI confirmed, "I am ready to work with you" and asked the CW if he could place an order for 200 missiles. The CW responded that initially defendant LAKHANI should order just one sample.

5. In a recorded telephone conversation on or about May 2, 2002, defendant LAKHANI informed the CW that he had met with the supplier and provided the CW with certain specifications of the missile, including its range and distance capabilities. Defendant LAKHANI told the CW that he would fax the specifications to the CW. On or about May 16, 2002, defendant LAKHANI sent by facsimile to the CW a brochure containing information and specifications for shoulder-fired surface-to-air missile systems. In a recorded conversation on or about May 17, 2002, defendant LAKHANI confirmed that the CW had received the fax and that it was the type of item in which the buyer was interested.

6. In numerous recorded conversations between in or about May, 2002 and August, 2002, defendant LAKHANI and the CW continued to discuss the importation of the surface-to-air missile into the United States. They discussed, among other things, what type of merchandise would be listed on the shipping

documentation and who would be responsible for paying the cost of shipment. In a recorded conversation on or about August 17, 2002, regarding delays in completing the deal, defendant LAKHANI stated that he understood that the buyer of the missile wanted it for "the anniversary" -- a reference to the upcoming one-year anniversary of the terrorist attacks of September 11, 2001. On or about August 20, 2002, defendant LAKHANI faxed to the CW in New Jersey a document listing the price for an "'Igla-S' portable anti-aircraft missile complex," including a price breakdown between "missile" and "launcher device." In a recorded conversation on or about August 21, 2002, defendant LAKHANI explained to the CW different features of certain of the missiles highlighted in the materials he had faxed to the CW. In a recorded conversation on or about August 29, 2002, defendant LAKHANI told the CW that he had spoken to the supplier, who was concerned that the deal involving just one missile was "too risky." As a result, defendant LAKHANI informed the CW, defendant LAKHANI had committed to the supplier that there would be a purchase of at least an additional 20 missiles.

7. On or about September 17, 2002, defendant LAKHANI flew from London, England to New Jersey to meet with the CW. In an audio and video recorded meeting at a hotel overlooking Newark Liberty International Airport, defendant LAKHANI and the CW discussed the ongoing deal. In particular, they discussed how the missile to be imported would be used. When, in this regard, the CW gestured to commercial aircraft taking off and landing at the airport, defendant LAKHANI confirmed his understanding that such aircraft would be the target of a missile attack and asked the CW who would do it. The CW confirmed for defendant LAKHANI that the CW's role was simply to help arrange the purchase and importation and that the rest would be up to the "Somalis," who believed in "jihad" and favored American domestic targets rather than American targets abroad. Defendant LAKHANI further verified with the CW that the purpose of shooting down a commercial aircraft was to cause economic harm to the United States, stating, "make one explosion . . . to shake the economy." Defendant LAKHANI and the CW also discussed the price of the missile and the launcher.

8. In recorded telephone conversations in or about September, 2002, subsequent to the September 17, 2002 in-person meeting, defendant LAKHANI reminded the CW that the CW, on behalf of the buyer, was responsible for paying for all expenses, including bribes which had to be paid. On or about September 24, 2002, defendant LAKHANI caused additional specifications regarding shoulder-fired surface-to-air missiles to be sent by facsimile to the CW. This information included distances for the

engagement of aerial targets, missile weight, missile caliber, missile length, and warhead weight. Later on or about September 24, 2002, defendant LAKHANI caused to be sent by facsimile to the CW bank account information to be used in directing payment for the missile.

9. In a recorded conversation on or about October 2, 2002, defendant LAKHANI informed the CW that a downpayment was necessary and that he had someone who would pick up money from "there" and bring it "over here." Defendant LAKHANI stated that the CW would be able to verify that he was dealing with the correct person by means of a code. On or about October 3, 2002, an individual (hereinafter referred to as "the Individual") contacted the CW by telephone from the United Kingdom. In recorded conversations that day, the Individual told the CW that he was calling on behalf of defendant LAKHANI regarding the money transfer. The Individual stated that he would put the CW in touch with his contact in New York for purposes of facilitating a cash downpayment by the CW. The Individual told the CW that he had to have only $100 bills, no smaller bills. The Individual gave the CW the telephone number for a second individual (hereinafter identified as "YA"). The Individual also gave the CW as a code the serial number of a $1 bill -- F83616063J -- which bill the Individual stated YA would have in his possession. At the time the CW made the cash downpayment to YA, the CW was to verify that YA was the correct contact person by verifying that YA had the $1 bill with that serial number. Shortly after the CW had a telephone conversation with the Individual, YA called the CW to discuss the money transfer. In a recorded conversation on or about October 4, 2002, defendant LAKHANI told the CW that there should be an advance payment of $30,000, with the balance to be paid after the missile parts had been taken out of the source country, assembled, packed into boxes, and placed into a sea container for shipment. In a recorded conversation on or about October 7, 2002, defendant LAKHANI and the CW discussed that the price of the missile would be $85,000.

10. On or about October 8, 2002, defendant LAKHANI caused to be faxed to the CW a document dated October 4, 2002, which stated in pertinent part that an "advance payment" of $30,000 was required and that the balance of funds would be due when the "launcher and missile" were packaged and loaded into the sea container. In a recorded conversation on or about October 8, 2002, defendant LAKHANI confirmed that the CW had received the fax and commented that although this was not an "easy job," they would get "the merchandise" from Moscow, Russia, and it will be "high class stuff."

11.  On or about October 16, 2002, the CW met with YA in an office in New York City and gave YA $30,000 in cash. When the CW asked YA if he had the dollar bill, YA produced a $1 bill with the serial number, F83616063J, that the Individual had previously provided to the CW.  Later on or about October 16, 2002, in a recorded telephone conversation, the CW confirmed for defendant LAKHANI that he had given $30,000 in cash to YA.  With regard to the larger deal in the future, defendant LAKHANI recommended that the buyer purchase one launcher, which he called "the one that throws," for ten missiles, which he called "the one to throw." In a recorded conversation on or about October 17, 2002, defendant LAKHANI confirmed for the CW that defendant LAKHANI had verified with the Individual that the CW had given the money to YA.  Defendant LAKHANI noted that the five percent commission for the transfer was still outstanding.

12.  In or about November, 2002, defendant LAKHANI and the CW had numerous recorded conversations regarding shipment and payment for the surface-to-air missile.  In a recorded conversation on or about November 12, 2002, defendant LAKHANI told the CW that the supplier wanted full payment before the missile would be shipped.  During a recorded conversation on or about November 20, 2002, defendant LAKHANI remarked to the CW that the deal was "very dangerous" and "not very easy."  In a recorded telephone conversation on or about November 21, 2002, defendant LAKHANI noted that after "that accident," an apparent reference to the September 11, 2001 terrorist attacks in the United States, it has become more difficult to engage in international arms trafficking.  When the CW suggested that the next payment be made by depositing money directly into the supplier's account, defendant LAKHANI responded, "No, you will get caught.  Try to save your skin . . . This business is getting so dangerous.  No one has the guts to do it . . . I won't do anything if it is risky."

13.  In a recorded conversation on or about December 6, 2002, defendant LAKHANI told the CW to obtain the issues of <u>Time</u> and <u>Newsweek</u> magazines dated December 9, 2002.  Both of those magazines featured stories concerning the attempt by terrorists to shoot down a commercial aircraft with a shoulder-fired surface-to-air missile in Kenya on November 28, 2002.  In a recorded conversation on or about December 7, 2002, defendant LAKHANI made an apparent reference to the model of surface-to-air missile used in the Kenya attack, stating, "ours is much higher quality" and that the one referenced in the news story was a "60s model."  The SA-7 model surface-to-air missile used in the Kenya attack was first manufactured in the 1960s.

14. In numerous recorded conversations from in or about December, 2002 through March, 2003, defendant LAKHANI and the CW continued to discuss payment arrangements for the missile. In a recorded conversation on or about February 11, 2003, defendant LAKHANI told the CW that he had received a fax from the supplier and that he would forward it plus a news article to the CW. Later that day, the CW received a two-page fax. The first page of this fax contained bank account information. The second page was a copy of a news article from the Financial Times of London discussing attempted sales of surface-to-air missiles by unauthorized Russian suppliers to Iraq. On or about February 16, 2003, defendant LAKHANI faxed to the CW a letter purporting to be from the supplier requesting that the "required amount" be transferred "to the new banking details" forwarded previously. On or about February 20, 2003, defendant LAKHANI faxed to the CW an invoice purporting to be from a company in Cyprus for "spare parts for medical facilities" and "spare parts for laboratory bench," with a total price of $60,000. The origin of the goods was listed as Russia, and the buyer of the goods was left blank on the invoice. The invoice also provided account information for a foreign bank account where payment was to be made. On or about March 4, 2003, law enforcement wire transferred as final payment $56,500 to the foreign bank account according to the instructions of defendant LAKHANI. Thereafter, defendant LAKHANI and the CW continued to discuss shipment arrangements for the missile.

15. In recorded telephone conversations from in or about March, 2003 through in or about April, 2003, defendant LAKHANI and the CW continued to discuss shipping details regarding the missile. Defendant LAKHANI told the CW that the missile would be shipped from St. Petersburg, Russia under shipping documents listing "spare parts." Defendant LAKHANI repeatedly warned the CW of the need for caution in the transaction because of the watchful climate in the world, particularly in the United States. In or about June, 2003, defendant LAKHANI and the CW discussed arrangements for the CW to travel to Moscow with defendant LAKHANI to finalize the missile deal.

16. On or about July 12, 2003, defendant LAKHANI traveled to Moscow, Russia to meet with the suppliers and the CW in order to finalize the sale of the missile. On or about July 14, 2003, defendant LAKHANI met with the CW and two officers of the Russian Federal Security Service ("FSB"), posing in an undercover capacity as the suppliers, in an office in Moscow. During this meeting, which was audio and video taped, the FSB Officers showed defendant LAKHANI and the CW what appeared to be an actual surface-to-air missile. In reality, no real missile was present.

Rather, unbeknownst to defendant LAKHANI, law enforcement had infiltrated the deal and substituted a replica of a surface-to-air missile for a real weapon. Defendant LAKHANI observed the demonstration, at times picking up the replica missile. Also at this meeting, payment for the missile was discussed. Defendant LAKHANI indicated that he could pay the suppliers' asking price of $70,000 for the missile when the missile was ready for shipment in St. Petersburg within a few days. During this meeting and in subsequent meetings that week in Russia, defendant LAKHANI asserted to the CW that he, defendant LAKHANI, was to take the lead in dealing with the suppliers on the missile purchase.

17. On or about July 15, 2003, defendant LAKHANI met with the CW and the two FSB Officers in St. Petersburg, Russia, the port from which the missile was to be shipped. During the conversation that night, defendant LAKHANI told the FSB Officers that he wanted a commitment from them to ship an additional 50 surface-to-air missiles to the United States by August 30, 2003. During the discussion, defendant LAKHANI wrote on a piece of paper, among other things, "Qty 50 pcs," "Delivery: 15th Aug to 30/8/03" and "Payment idea - 10% advance balance payment in cash in New York."

18. On or about July 16, 2003, in a recorded meeting, defendant LAKHANI met with the CW and the two FSB Officers near the port area of St. Petersburg, Russia. Defendant LAKHANI and the CW were once again shown the replica surface-to-air missile in order to demonstrate that the missile was ready for shipment. Defendant LAKHANI and the FSB Officers discussed how defendant LAKHANI would make payment for the missile. Defendant LAKHANI once again discussed with the FSB Officers his desire to arrange a deal for the purchase of an additional 50 surface-to-air missiles. In addition, defendant LAKHANI expressed an interest in purchasing a multi-ton quantity of C-4 plastic explosive.

19. On or about July 18, 2003, in a recorded meeting, defendant LAKHANI provided to the FSB Officers as proof of payment for the missile a document on corporate letterhead stating that the company had authorized its bank to release payment of $70,000 to the bank account specified by the FSB Officers.

20. On or about July 25, 2003, defendant LAKHANI faxed to the CW a copy of the bill of lading for the shipment, indicating that the goods being shipped were "medical equipment." Also in or about late July, 2003, defendant LAKHANI and the CW discussed that defendant LAKHANI would travel to New Jersey for a meeting

with the CW and the buyers, whom the CW represents, to discuss the larger deal for the purchase of surface-to-air missiles.

21. Representatives of the Department of State's Directorate of Defense Trade Controls ("DDTC") have advised that the shoulder-fired surface-to-air missiles at issue in this case, i.e, the Russian manufactured Igla-S portable anti-aircraft missile complex, are foreign "defense articles" subject to their regulatory authority. DDTC representatives have further indicated that a records check reveals that defendant LAKHANI is neither registered with their agency nor licensed to engage in the business of brokering with respect to the import or transfer of any defense articles.