# KLINGEMAN TURANO LLC
―――――――――ATTORNEYS AT LAW―――――――――

HENRY E. KLINGEMAN\*+
STEPHEN TURANO°
Of Counsel
KARIN S. RIECKER°
NANCY M. KLINGEMAN

\*Admitted, NJ, PA & HI
+Certified by the Supreme Court of
   New Jersey as a Criminal Trial Attorney
°Admitted, NJ & NY

230 MAIN STREET
SECOND FLOOR
MADISON, NEW JERSEY 07940
TEL: (973) 236-0010
FAX: (973) 236-0012
www.ktlawyers.com

**Document Electronically Filed**

January 3, 2005

Writer's Direct Line:
(973) 236-0114

Writer's E-Mail Address:
hek@ktlawyers.com

Honorable Katharine S. Hayden
United States District Court
United States Post Office & Courthouse
Federal Square
Newark, NJ 07101

    Re:    United States v. Hemant Lakhani
              Crim. No. 03-880 (KSH)

Dear Judge Hayden:

    Please accept this letter in lieu of a more formal brief addressing the Government's December 2, 2004 in limine motions. At a hearing on December 22, 2004, the Court indicated that it would rule on the motions after the Government disclosed its Jencks and Giglio material, which the Government now has done. Based on the Government's disclosures and the results of the defense investigation, defendant Hemant Lakhani respectfully requests that the Court permit cross examination and testimony as set forth below.

## Background

    The Government's motions are focused on two prospective trial witnesses: MR and Charles Lee.

    MR is the Government's paid informant whose many conversations with defendant Hemant Lakhani on the telephone and in person form the most critical evidence in the Government's case. MR, a Pakistani, was an informant for the Drug Enforcement Administration ("DEA") during the 1990s in that country. MR came to the United States in the mid-1990s and continued to act as a Government informant, first for the DEA and subsequently for the Federal Bureau of Investigation ("FBI").

    Based on the Government's Jencks and Giglio disclosures, as well as the defense investigation to date, MR has substantial credibility problems. For example, MR has

Honorable Katharine S. Hayden
United States District Court
January 3, 2005
Page 2 of 9

moved around the United States, from the East Coast through the Midwest, since arriving here to live. While the Government is likely to explain his frequent moving by pointing to operational and security necessities, MR has left a trail of broken financial commitments in his wake. The defense will contend that these financial breaches manifest MR's deceitful character and are, therefore, highly probative of his credibility under Fed. R. Evid. 608(b) and otherwise.

Charles Lee is a retired Special Agent from the DEA. He served this country effectively and honorably in Pakistan and in the United States. Like the federal agents in this case, Lee made use of informants as a critical tool in undercover investigation. One of Lee's informants in Pakistan and the United States was MR.

After MR moved to the United States and Lee retired from DEA, the men formed a business partnership to distribute wholesale basmati rice imported from Pakistan in the United States. The name of the company they formed was (and is) Halee International, Inc., an amalgam of their last names. Lee also vouched for MR when the FBI recruited MR as an informant in 1999. Lee ended his association with MR when he learned that MR had defrauded two customers by selling each of them the same shipment of rice. Lee also found out about other misconduct committed by MR during his permanent residence in the United States. Prior to September 11, 2001 (and thus prior to the initiation of the investigation of defendant Lakhani), Lee wrote a nine-page letter describing his and others' experiences with MR and delivered it personally to FBI Special Agent Cynthia McGrath of the Minneapolis Field Office. (A copy of Lee's letter is attached as Exhibit 1.)

Point 1
<u>The Cooperating Witness</u>

The Government is asking the Court to preclude cross examination of Government witness MR with respect to alleged personal misconduct:

(1) Failure to pay two months' rent in Kansas in 1998

(2) Passing a bad check in Kansas in 1999

(3) Civil business disputes

The Government is also asking the Court to preclude testimony by potential defense witness Charles Lee about MR's personal misconduct:

(1) MR (when acting as Lee's business partner) sold the same quantity of wholesale rice to two different buyers

  (2) MR set up another non-terrorist, non-criminal in a sting operation mirroring the <u>Lakhani</u> case

  (3) [redacted at the Government's request; to be addressed at sidebar]

  The Government's applications to limit the cross examination of MR and limit the direct testimony of Charles Lee must be view separately. In brief, Lakhani, through counsel, should be permitted to cross examine MR about all of the matters listed by the Government and to confront him with documentary evidence during cross examination. On the other hand, Lakhani, through counsel, may limit Lee's testimony to his opinion of MR's character for truthfulness, consistent with Fed R. Evid. 608.

  Rule 608(b) provides, in part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

  The rule was amended in 2003 "to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness." Fed. R. Evid. 608 advisory committee notes (2003 amendments) (citing <u>United States v. Abel</u>, 469 U.S. 45 (1984)).

  The 2003 advisory committee notes continue:

> By limiting the application of the Rule to proof of a witness' character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 402.

  <u>Id</u>. (citing cases).

As to what constitutes "extrinsic evidence," it is "evidence offered through other witnesses, rather than through cross examination of the witness himself or herself." United States v. McNeill, 887 F.2d 448, 453 (3d Cir. 1989). Based on the above authorities (as opposed to the dated, inapposite authorities relied upon by the Government), the defense should be permitted to confront MR with his record of fraud, including the documents that prove it.

### MR's Cross Examination

The Government's December 28, 2004 Giglio disclosure letter sets forth extensive impeachment material about MR. (A copy of the letter is attached as Exhibit 2.) The letter is presumably based on MR's admissions and the Government's own investigation. Despite its length and detail, however, it only tells part of the story.

Since beginning to work as a paid informant for Pakistani law enforcement, the DEA, and the FBI, MR has been paid almost $500,000.[1] (He will continue to be paid at least $6,000 per month.) Additionally, since coming to the United States in 1995, MR has involved himself in numerous business opportunities and made financial commitments, large and small. He has undertaken these activities in at least five states: New York, Kansas, Wisconsin, Minnesota, and Pennsylvania. The Government has selected two episodes and diminished their significance by describing them as innocent misunderstandings. The defense sharply disagrees with the Government's mild characterizations of MR's conduct. Suffice to say, MR has left a trail of broken financial commitments from New York to Kansas to Minnesota to Pennsylvania, all in the less than ten years he has lived in the United States and all while he has been paid hundreds of thousands of dollars by the U.S. government.

The defense is separately providing to the Court a summary of the impeachment material it has obtained for review by the Court ex parte. Because the element of surprise is a key component to effective cross examination, the defense respectfully requests that the impeachment material not be disclosed to the Government until MR has been tendered for cross examination.

The defense impeachment material lays out a pattern of large-scale financial fraud committed by MR during his stay in the U.S. His documented debts exceed $700,000; he

---

[1] The Government attributes part of this compensation to helping MR move frequently and protect himself from unspecified threats to his safety. During his entire period of residence in the United States, however, MR has lived openly under his own name to the extent that numerous aggrieved parties have been able to find him and serve him with legal process. Additionally, an enterprising reporter for the Star-Ledger was able to locate MR and visit his home in March 2004 and a defense investigator has been able to trace his path in the United States up to the current time. The notorious way MR has chosen to live in the U.S. and the ease with which a newspaper reporter and a private investigator have been able to track him belie the Government's claim that MR has been and is in jeopardy.

Honorable Katharine S. Hayden
United States District Court
January 3, 2005
Page 5 of 9

has no fewer than six judgments against him in four states; he owes at least $9,000 in back taxes to the U.S. government alone; and numerous persons and entities have accused him of fraud, amply supported by evidence. While each episode could be isolated and then explained as a mistake or misjudgment (as the Government has attempted to do with two lower-dollar incidents), such a conclusion is impossible when his conduct is viewed as a whole. No person – even a person prone to financial disorganization – racks up the debts, judgments, and accusations of fraud that MR has in the less than ten years he has lived in the United States. When one considers that he is here as a guest of the United States government, brought here for his own asserted protection to work as a paid informant, the conclusion one must necessarily draw is obvious: MR, who got his start as a drug smuggler in Pakistan and has made a career of informing on others in exchange for nearly $500,000 in government payments, regards himself as a above the law.

At least some in law enforcement have recognized MR's true character and his disqualification as a reliable source for information and assistance. The defense has already provided to the Court witness Charles Lee's nine-page summary of MR's crimes, frauds, and wrongs. Lee, of course, is a retired DEA agent who used MR as an informant. Lee delivered his summary personally to FBI Special Agent Cynthia McGrath of the Minneapolis field office.

The Government has disclosed that FBI Special Agent McGrath closed MR's file and wrote a memo dated July 25, 2001, i.e., less than two months before 9/11 and several months before MR targeted defendant Lakhani in this investigation. McGrath first noted that MR had moved from the area. Then, she continued:

> Additionally, the writer has been made aware of accusations of fraud being made against the asset [MR]. Asset established a business catering to the Muslim community and been accused of not paying bills and double selling product. It should be noted that several of his accusers are conducting various types of fraud as well as reported by the asset and corroborated through other means. The asset's reliability has most recently been characterized as reliable. <u>Due to the apparent lack of trustworthiness</u> and asset's relocation, asset is being closed.

12/28/2004 Letter from AUSAs Stuart Rabner and Brian Howe to Henry E. Klingeman, Esq. at 4 (quoting 7/25/01 internal memo by FBI Special Agent Cynthia McGrath) (emphasis added).

Honorable Katharine S. Hayden
United States District Court
January 3, 2005
Page 6 of 9

The defense has provided the Government with a subpoena for McGrath to testify at trial. Despite Lee's warnings and McGrath's conclusion, the temptation to use the wily MR proved too much for the FBI in Newark in the aftermath of 9/11.

MR's deceptive conduct is relevant for a number of reasons:

MR's credibility. MR's credibility is critical to the Government's case. MR is the only witness who can testify knowledgably about the many conversations that the Government taped with defendant Lakhani. In most (though not all) conversations, MR and Lakhani are the only participants. They speak in languages (Hindi and Urdu) understood by them and not (so far as the defense knows) by either the prosecutors or the case agents. Thus, during the course of the 21 month-long investigation, the agents were often depending upon MR to relate to them the substance of conversations with Lakhani. Moreover, the defense understands that MR has participated in the preparation of the more than 250 transcripts to be offered to the jury as proof of Lakhani's intent. The accuracy of the transcripts will be central to both the Government and the defense. Consequently, if the defense can effectively attack MR's credibility, then it can effectively attack the transcripts' credibility. This is not a case where the integrity of the informant is irrelevant because the tapes prove what was said. Given the role of the informant in the translation, explanation, and interpretation of the tapes, the defense must be permitted to explore fully MR's personal credibility.

MR's cooperation/FBI's supervision. MR's agreement with the Government explicitly or implicitly required him to refrain from fraudulent activity and to be candid with the Government as to his activities. The Government has paid MR hundreds of thousands of dollars to compensate him for his assistance. The Government surely did not intend, expect, or even know that MR was ripping off people with whom he made business agreements, just as those people did not know that MR was a Pakistani drug trafficker turned paid government informant. If the Government had know that MR was committing serial fraud in five states, then it would not have paid him so handsomely, much less relied upon him to fight the war on terror. This conclusion raises the obvious questions: What did the Government know and when did it know it?

Based on the Government's Giglio disclosure and in limine motions, the answer is "not much." The implications of this answer are obvious. Thus, the defense should be permitted to confront MR with the trail of financial fraud. Yes, we have to take his answers as they are, but we are entitled to ask the questions and confront him with the documents.

Motive. MR's fraudulent conduct occurred both when he was and was not actively working as a paid informant. His willingness to engage in fraudulent conduct when he was being paid hundreds of thousands of dollars by the U.S. government establishes his deceptive character; he disregarded his obligations to both his creditors

Honorable Katharine S. Hayden
United States District Court
January 3, 2005
Page 7 of 9

(who expected him to honor his obligations) and his Government handlers (who expected him not to commit fraud). His willingness to engage in fraudulent conduct when he was not working as an informant, e.g., in 1998, establishes a strong motive to get back in the business of being an informant. Indeed, the only legal way MR has made money to support himself and his family since 1986 has been to act as a government-paid informant.

Even though MR has been the subject of judgments since 1998, the Government has continued to pay him. So long as he produces to the Government's satisfaction, MR has a "clean" source of income free from enforcement proceedings, garnishment, or information subpoenas. What stronger motivation is there to target anyone whom the Government might want to investigate? The investigations take years to complete, successfully or otherwise, and the Government never asks for its money back. Given defendant Lakhani's lack of history as an illegal arms trafficker, the defense should be permitted to develop the argument that MR needed money but had no real target, so he made one up.

<u>Contradiction</u>. MR may testify on direct examination (and cross, too) in ways that contradict the evidence summarized above and in the defense's accompanying letter. Contradictory testimony alone will provide an independent basis to introduce extrinsic evidence challenging the testimony. The Court will have to hear MR's testimony before precluding any of this evidence.

Given these various rationales for admitting the extrinsic evidence, the evidence cannot be considered collateral for impeachment purposes. Defense counsel should be permitted to introduce the evidence during MR's cross examination and corroborate it if he denies it.

<u>Charles Lee's Testimony</u>

The defense cannot decide in advance whether Mr. Lee will testify and would respectfully request delaying a judicial determination as to the scope of his testimony until that decision is made. Nonetheless, it is clear that Lee can testify as to his opinion of MR's character for truthfulness, as well as MR's reputation in the community in which they both dwelt.

Honorable Katharine S. Hayden
United States District Court
January 3, 2005
Page 8 of 9

Point 2
<u>Government Exhibit 8—Shoulder-Launched Missile Video Presentation</u>

The Government intends to present a video of soldiers firing a shoulder-launched missile that blows up a flying object. The video, in the form of a CD, has been marked for identification as Government Exhibit 8. Defendant Lakhani objects to the admission of this evidence pursuant to Fed. R. Evid. 403. The prejudicial effect of the video substantially outweighs its probative value.

The probative value of the video lies in its visual demonstration of the capability of a shoulder-launched missile. Not even lay jurors, however, will be unfamiliar with a shoulder-launched missile after the balance of the Government's case-in-chief. The Government will introduce the actual fake missile it manufactured to use in meetings with Lakhani.[2] It will present testimony from a Government expert about shoulder-launched missiles. It will present documents obtained from Lakhani about shoulder-launched missiles. It will produce video of meetings at which the fake missile was displayed and discussed in technical terms. This is more than enough to explain to the jury what the shoulder-launched missile is and what it can do.

The Government's demonstration video, however, will inflame the jury and should be excluded for a number of other reasons:

First, the video subtly sends a message to the jurors: Any of you could have been on a plane and here's what would happen to that plane, just like the object in the video.

Second, the video shows soldiers, presumably American soldiers, test-launching American military technology to protect American citizens. The missile in question, however, is a non-American make not used by the American military.

Third, the Government chose a shoulder-launched missile as the type of weapon it entreated Lakhani to sell. He had never sold any shoulder-launched missiles in the past. Having made this selection, the Government now wants to exploit its visually-dramatic destructive power. If this were merely a firearms-trafficking case, the Government would not be offering video of agents firing guns.

Fourth, and finally, the defense will not contest the capability of a shoulder-launched missile.

---

[2] While "the Government" to which we refer consists primarily of U.S. government agencies, including the Department of Justice, the Department of Homeland Security, the FBI, the Department of Immigration and Customs Enforcement, and the U.S. Attorney's Office in New Jersey, the Russian FSB (formerly KGB) was a full partner in this investigation and appears to have supplied the fake missile.

Honorable Katharine S. Hayden
United States District Court
January 3, 2005
Page 9 of 9

Government exhibit 8 should be excluded.

Thank you for your attention.

           Respectfully submitted,

           KLINGEMAN TURANO LLC

           /s/ Henry E. Klingeman (HK 6007)
           Klingeman Turano LLC
           230 Main Street, 2nd Floor
           Madison, NJ 07940
           TEL 973-236-0114
           FAX 973-236-0012
           EMAIL hek@ktlawyers.com

Enclosure (submitted ex parte)

cc:    AUSA Stuart J. Rabner (w/o enclosure)
       AUSA Brian R. Howe (w/o enclosure)
       Mr. Hemant Lakhani