**DOCUMENT FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | Crim. No. 03-880 (KSH) |
| : | Honorable Katharine S. Hayden |
| v. : | |
| : | |
| HEMANT LAKHANI : | Sentencing Date: Sept. 12, 2005 2:00 p.m. |

---

**DEFENDANT HEMANT LAKHANI'S BRIEF IN SUPPORT OF
POST-TRIAL MOTIONS AND SENTENCING MEMORANDUM**

---

KLINGEMAN TURANO LLC
230 Main Street, Second Floor
Madison, NJ 07940
TEL 973-236-0114
FAX 973-236-0012
EMAIL hek@ktlawyers.com
Attorneys for Defendant
HEMANT LAKHANI

On the Brief:

HENRY E. KLINGEMAN

## TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                                 1

DISCUSSION

    Point 1                                                                       2

    THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT
    BECAUSE THE PROSECUTION VIOLATES DEFENDANT LAKHANI'S
    RIGHT TO DUE PROCESS

    Point 2                                                                       8

    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL
    BECAUSE THE GOVERNMENT FAILED TO PRODUCE SUFFICIENT
    EVIDENCE TO PROVE PREDISPOSITION BEYOND A
    REASONABLE DOUBT

    Point 3                                                                      10

    THE COURT SHOULD ORDER A NEW TRIAL BASED ON JUROR
    MISCONDUCT DURING DELIBERATIONS

    Point 4                                                                      14

    THE COURT SHOULD EXERCISE LENIENCY BASED ON THE
    FACTORS IDENTIFIED IN 18 U.S.C. 3553(b)

CONCLUSION                                                                            17

# LIST OF EXHIBITS

| Number | Description |
|---|---|
| 1 | Affidavit of Debora Leehr |
| 2 | Transcribed excerpt from radio interview with jurors (air date July 8, 2005) |
| 3 | August 8, 2005 Hemant Lakhani letter to Judge Hayden |
| 4 | June 15, 2005 Kusum Lakhani letter to Judge Hayden |
| 5 | Sanjay Lakhani letter to Judge Hayden |
| 6-22 | Seventeen (17) letters concerning Hemant Lakhani addressed to Judge Hayden |
| 23 | Lakhani Family Portfolio prepared by Kusum Lakhani (2005) (bound separately) |

## **PRELIMINARY STATEMENT**

Defendant Hemant Lakhani submits this Brief and Memorandum in support of post-trial motions and in mitigation of sentence.

Specifically, Mr. Lakhani moves for the following alternative relief:

(1) the Court should dismiss the Superseding Indictment because the prosecution violates Defendant Lakhani's right to due process;

(2) the Court should enter a judgment of acquittal because the Government failed to produce sufficient evidence to prove predisposition beyond a reasonable doubt; or

(3) the Court should order a new trial based on juror misconduct.

In the event this Court denies the relief sought, Mr. Lakhani asks the Court to consider the Sentencing Memorandum portion of this submission before imposing sentence.

Finally, this Court has presided over the case since Indictment in December 2003; it heard the testimony and examined the evidence during the lengthy trial. According, Mr. Lakhani will not burden the Court with an additional summary of the facts. Mr. Lakhani will address the facts as necessary to the discussion of the issues below and is prepared to provide record citations, if the Court should want them.

1

## DISCUSSION

### Point 1

### THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT BECAUSE THE PROSECUTION VIOLATES DEFENDANT LAKHANI'S RIGHT TO DUE PROCESS

Pursuant to Rule 29, Defendant Lakhani seeks dismissal of the Superseding Indictment or, alternatively, pursuant to Rule 33, a new trial.[1] The Government's sting operation deprived Mr. Lakhani of his Fifth Amendment right to due process under United States v. Twigg, 588 F.2d 373 (3d Cir. 1978).

In Twigg, our Circuit Court held:

> [A]lthough proof of predisposition to commit the crime will bar application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was "outrageous."

588 F.2d at 378-79.

The Third Circuit acknowledged the difficulty in discerning this standard:

> Attempting to draw general principles of law from these cases is not a simple task. We are mindful of the difficulties of defining specific limits on law enforcement techniques. Recognition must be given to the many challenges confronting police agencies today, especially in the drug law

---

[1] Rule 33 of the Federal Rules of Evidence provides in part:

> Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.

Fed. R. Crim. P. 33(a) & (b)(1). Mr. Lakhani reserved his right to file the motion at the time the verdict was rendered.

In a Fed.R.Crim.P. 33 motion for a new trial based on the "weight of the evidence," the Court can order a new trial only if it "believes that there is a serious danger that a miscarriage of justice has occurred-- that is, that an innocent person has been convicted." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (internal quotations and citations omitted). Unlike a Rule 29 motion, the Court does not view the evidence favorably to the government in a Rule 33 motion, "but instead exercises its own judgment in assessing the government's case." Id. (citations omitted). The Third Circuit, however, has stated that Rule 33 motions are not favored and "are to be granted sparingly and only in exceptional cases." Government of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir.1987) (citations omitted).

2

> enforcement area. Infiltration of criminal operations by informers and undercover agents is an accepted and necessary practice. Yet, this court cannot "shirk the responsibility that is necessarily in its keeping . . . to accommodate the dangers of overzealous law enforcement and civilized methods adequate to counter the ingenuity of modern criminals." <u>Sherman v. United States</u>, 356 U.S. 369, 381, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring in result). "Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality." <u>United States v. Archer</u>, 486 F.2d 670, 677 (2d Cir. 1973) (Friendly, J.).

<u>Id</u>. at 380.

If anything, Mr. Lakhani's case is more compelling than the defendants in <u>Twigg</u>. The following is a comparison of the facts and circumstances relied upon by the court in <u>Twigg</u> to those of <u>Lakhani</u>:

> [<u>Twigg</u>:] At the behest of the Drug Enforcement Agency, Kubica, a convicted felon striving to reduce the severity of his sentence, communicated with Neville and suggested the establishment of a speed laboratory.

<u>Twigg</u>, 588 F.2d at 380.

In <u>Lakhani</u>, the Government's Confidential Informant ("CI") (Muhammad Habib Ur Rehman) suggested targeting Lakhani. The CI's motive was pecuniary. The CI communicated with Lakhani to suggest the criminal activity.

> [<u>Twigg</u>:] The Government gratuitously supplied about 20 percent of the glassware and the indispensable ingredient, phenyl-2-propanone. It is unclear whether the parties had the means or the money to obtain the chemical on their own. The DEA made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials. Kubica, operating under the business name "Chem Kleen" supplied by the DEA, actually purchased all of the supplies with the exception of a separatory funnel. (The funnel was secured by Twigg at the direction of Kubica who was engaged in operating the laboratory.)

<u>Id</u>.

3

In Lakhani, the Government supplied the missile; the "supplier" (actually Russian Federal Security Police); means of export (from Russia); the means of import (to the United States; and the financing for the transaction. It was clear from the beginning and throughout the nearly two year undercover investigation that Lakhani lacked the financial means (and all other means, for that matter) to conduct the CI's proposed transaction.

> [Twigg:] When problems were encountered in locating an adequate production site, the Government found the solution by providing an isolated farmhouse well-suited for the location of an illegally operated laboratory. Again, there was no cost to the defendants.

Id.

In Lakhani, the Government provided the seller of the missile once "problems" developed, making it evident that Lakhani could not produce a seller himself.

> [Twigg:] At all times during the production process, Kubica was completely in charge and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of Kubica,

Id. at 380-81.

In Lakhani, the CI was completely in charge, directing the criminal activity, furnishing instructions to Lakhani, and, ultimately, the missile itself. The tape-recorded conversations between the CI, the Russian agents, and Lakhani constantly and consistently demonstrate Lakhani's lack of know-how and his inability to conduct the transaction the CI solicited him to conduct. Moreover, Lakhani provided no assistance to the consummation of the missile importation. Lakhani's utter failure to deliver on any of his bold promises combined with the Government's necessary contribution to every aspect of the deal establish Lakhani's unworthiness as a target of this investigation.

4

> [Twigg:] We also find it baffling that the Government would urge the reduction of the jail sentence for a man who may have run as many as 50 or 100 speed laboratories in the past in exchange for the convictions of two men with no apparent criminal designs and without the expertise required to set up a single laboratory.

Id. at 381 n.9.

In Lakhani, the Government utilized a CI whose credibility was questioned before September 11, 2001, by both his handlers at the Federal Bureau of Investigation and the Drug Enforcement Administration. On the Government's watch, the CI has defrauded more than a half-dozen others in several states of hundreds of thousands of dollars. Moreover, the Government has seen fit to pay the CI hundreds of thousands of dollars while his debts go unsatisfied, including to the Internal Revenue Service. All of this was condoned in service to the investigation and prosecution of Mr. Lakhani, a man with no apparent criminal designs and without the expertise required to conduct the transaction requested of him by the CI.

> [Twigg:] These instances of police involvement must be evaluated against the following backdrop. The only evidence that Neville was predisposed to commit the crime was his receptivity to Kubica's proposal to engage in the venture and the testimony of Kubica that he had worked with Neville in a similar laboratory four years earlier. Unlike other cases rejecting this defense, the police investigation here was not concerned with an existing laboratory, [citation omitted]; the illicit plan did not originate with the criminal defendants, [citations omitted]; and neither of the defendants were chemists, an indispensable requisite to this criminal enterprise.

Id. at 381.

In Lakhani, the only evidence of predisposition was the CI's December 2001 statement to the FBI that Mr. Lakhani was involved in a laundry list of criminal and terrorist-supporting activity. Even the FBI agent to whom the CI made his allegations admitted at trial that none of the allegations proved true. Unlike the typical

5

predisposition scenario, there is no allegation, not to mention evidence, that Mr. Lakhani ever engaged in an illegal arms transaction, in support of terrorists or otherwise. Here, there was no existing arms activity to which Mr. Lakhani was a party and which the Government wanted to infiltrate; the illicit plan did not originate with Mr. Lakhani; and Mr. Lakhani was not an arms dealer (notwithstanding his manifestly outlandish boasts), an indispensable requisite to this criminal activity.

> [Twigg:] When Kubica, at the instance of the DEA, reestablished contact with Neville, the latter was not engaged in any illicit drug activity. Using Kubica, and actively participating with him, the DEA agents deceptively implanted the criminal design in Neville's mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

Id.

In Lakhani, Mr. Lakhani was not engaged in any illicit arms activity when he was asked by the CI to participate in the missile sale. Incontestably, the CI (at the FBI's behest) placed the criminal design in Mr. Lakhani's mind. The Government set him up, encouraged him, provided the essential supplies and technical expertise, and when he encountered difficulties in consummating the crime, they assisted in finding solutions. The Government generated a series of new and fictional crimes by Mr. Lakhani merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs.

Prospectively-speaking, the Twigg court promised, "[f]undamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution

6

for a crime so fomented by them will be barred." Id. (emphasis added). This 28 year-old precedent has been bruised and battered by commentary in our and other circuits. It has never, as near as can be determined, been used in this Circuit to void a subsequent prosecution. Nevertheless, it has never been overruled, either by the Circuit Court or the Supreme Court. And, if there were ever a case that fits squarely within Twigg's prohibition against Government overreaching, Lakhani is it.

Finally, in the post-9/11 climate, with our acute national priorities focused on preventing more terrorists acts, some inside of government would de-emphasize traditional restraints on government power in exchange for the appearance of greater security. As in prior times of national crisis, these instincts place fundamental principles of our national identity at risk. Instead, at a time of national crisis, our courts should strongly restrain the Government when it overreaches.

Given Twigg's manifest applicability here, Defendant Lakhani respectfully requests that the Superseding Indictment against him be dismissed.

## Point 2

## THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PRODUCE SUFFICIENT EVIDENCE TO PROVE PREDISPOSITION BEYOND A REASONABLE DOUBT

Defendant Lakhani respectfully asks this Court to enter a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.[2] The Government failed to produce sufficient evidence to convince a jury beyond a reasonable doubt that Mr. Lakhani was predisposed to commit the crimes in the Superseding Indictment.

In reviewing a Rule 29 motion, the Court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir.2001). The Court is obligated to "'draw all reasonable inferences in favor of the jury's verdict.'" United States v. Smith, 294 F.3d 473, 476 (3d Cir.2002) (quoting United States v. Anderskow, 88 F.3d 245, 251 (3d Cir.1996)). When examining the sufficiency of the evidence, the Court reviews the totality of the circumstances. United States v. Leon, 739 F.2d 885, 891 (3d Cir.1984) (citations omitted). That is, the Court must examine all of the evidence presented by the Government taken as a whole, and not consider pieces of the evidence in isolation. United States v. Picciotti, 40 F.Supp.2d 242, 245 (3d Cir.1999) (citations omitted). The Court may not grant a judgment of acquittal based upon credibility determinations, however, for "'it is up to the jury to weigh conflicting testimony, determine credibility, and ultimately draw factual inferences.'" United States v. Carmichael, 269 F.Supp.2d 588, 595 (quoting United States v. Scarfo, 711 F.Supp. 1315, 1334 (E.D.Pa.1989)); see

---

[2] Mr. Lakhani reserved his right to file the motion at the time the verdict was rendered.

8

United States v. Brodie, 403 F.3d 123, 133 (3d Cir.2005) (citations omitted) (stating that "[c]ourts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury."). Therefore, a finding of insufficiency should "'be confined to cases where the prosecution's failure is clear.'" Smith, 294 F.3d at 476 (quoting Leon, 739 F.2d at 891). A defendant challenging the sufficiency of the evidence bears a heavy burden. See United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir.1995); United States v. Casper, 956 F.2d 416, 421 (3d Cir.1992) (citation omitted). A defendant must overcome the jury's special province in evaluating witness credibility and conflicting testimony. See Carmichael, 269 F.Supp.2d at 594-95 (citations omitted).

This Court charged the jury on the defense of entrapment. To rebut the defense of entrapment, the Government had to convince the jury beyond a reasonable doubt that Mr. Lakhani was predisposed to commit the offense alleged in the Superseding Indictment. As the defense argued during summation, there is simply no evidence of predisposition. See Trial Transcript ("TT") vol. XVIII (April 21, 2005) at 89-97; TT vol. XIX (April 22, 2005) *passim*. Rather than repeat the arguments here, the defense respectfully incorporates by reference its arguments in summation to establish Mr. Lakhani's right to a judgment of acquittal pursuant to Rule 29.[3]

---

[3] Counsel is prepared to address this issue further at oral argument on September 12. In the event, the Court wants further written briefing on this point, counsel will provide it promptly.

9

### Point 3

### THE COURT SHOULD ORDER A NEW TRIAL BASED ON JUROR MISCONDUCT DURING DELIBERATIONS

Defendant Lakhani respectfully requests that the Court schedule an evidentiary hearing to take testimony from at least one juror, Gussie Burnett (identified as juror #9 for trial). Ms. Burnett has publicly stated since the April 27, 2005 verdict that she was effectively blackmailed by other jurors into voting for conviction. Ultimately, Mr. Lakhani is seeking a new trial based on juror misconduct pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Rule 33 provides in part:

> Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . . Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.

Fed. R. Crim. P. 33(a) & (b)(1).

This motion is based on newly-discovered evidence, specifically the public statements of Ms. Burnett that were broadcast on July 8, 2005, a little more than two months after the verdict.

Rule 606(b) of the Federal Rules of Evidence governs "Competency of Juror as Witness." The rule states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or <u>whether any outside influence was improperly brought to bear upon any juror.</u>

10

Fed. R. Evid. 606(b) (emphasis added).

The Third Circuit has said that "[t]estimony concerning 'intimidation or harassment of one juror by another' falls squarely within the core prohibition of [Fed. Rule of Evid. 606(b)]." United States v. Stansfield, 101 F.3d 909, 914 (3d Cir. 1996) (quoting Government of Virgin Islands v. Gereau, 523 F.2d 140, 150 (3d Cir. 1975)). The Third Circuit has further stated the objectives behind the rule as "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; [and] (5) maintaining the viability of the jury as a judicial decision-making body." Gereau, 523 F.2d at 148.

On July 8, 2005, Petra Bartosciewicz, reporting for "This American Life," a national radio program originating out of WBEZ in Chicago, filed an hour-long report entitled "The Arms Trader." Ms. Bartosciewicz interviewed attorneys involved on both sides of the case, as well as trial witnesses. Significantly, she also interviewed two jurors. During the interview, one of the jurors, Gussie Burnett, indicated that she never believed that Mr. Lakhani was guilty. See Exhibit 2 at 1-2. Instead, she stated that she voted to convict him because other jurors informed her that if she did not change her mind, they would all remain in the deliberation room for many months. Id. at 2. Juror Burnett stated that jurors were aware that in April she had closed on a house in Virginia and that she was anxious to move there. Id. Juror Burnett said that she was told she would not see the inside of her new house until December [2005] if she did not change her vote. Id.

11

Juror Burnett described her assessment of the case: As far as I'm concerned, it was entrapment. If he didn't actually do anything." Id. at 1. When the reporter said that it appeared that the other jurors believed Lakhani could have obtained a missile, if he had tried long enough, juror Burnett replied, "But did he try for 22 months and didn't get one? . . . [The other jurors] came in and they sat down and they said this man is guilty, guilty, guilty, guilty, guilty, guilty. They didn't even think about it. Hey wait a minute, let's analyze these things." Id. at 1-2.

But Ms. Burnett said that no one did and that they all just told her that if she did not change her mind, they would have to stay there for a very long time. Juror #6, who identified herself to the reporter as Donna, said, "The juror [Burnett] who felt that he was not guilty, I think felt overwhelmed by probably a good 6, 7, 8 jurors talking loudly at the same time that actually turned into screaming to be heard. It was probably very intimidating for her." Id. at 2. Juror Burnett explained it this way, "[W]hen we got to what count and I said to the man not guilty and there ain't nobody gonna change my mind and the Jury Foreman said if I didn't go along with them, I wouldn't see the inside of my house until December. So I said aw what the hell, he didn't mean nothing to me, man guilty. But I know it was wrong, it wasn't right for them to do that man like that. It wasn't right." Id. at 2. Ms. Burnett ended the interview by telling Ms. Bartosciewicz that she felt badly about her decision, "[A]s far as I'm concerned the man was entrapped. I should have held out." Id. at 2.

By her statements, juror Burnett clearly voted guilty not based on her analysis of the evidence, but rather based on her desire to leave the jury deliberation room sometime before "December," as was threatened by the Jury Foreman. In fact, nothing in her

12

interview suggests that she ever changed her mind about whether Mr. Lakhani was guilty. Rather, she changed her vote because she believed she could not change the minds of eleven other jurors, and she was told that her decision to hold out would cause them to continue deliberating until December. She concluded, "[Lakhani] didn't mean nothing to me, man guilty." Id. at 2.

  Juror Burnett was not approached by anyone related to the case. She made her own decision to participate in an interview with the press. Therefore, the type of harassment contemplated by the rule did not occur in this case. Based on both juror Burnett's statements and juror Donna's statements, there was not free and open discussion among the jurors. Juror Burnett indicated that she believed that Mr. Lakhani had been entrapped and she was told that if she did not change her vote, the deliberations would continue until December. Therefore, the only type of discussions that would be discouraged by this motion and a hearing would be harassment by the majority of the minority without any authentic discussion pertaining to the case. Next, nothing about this scenario could alter the notion that holding a hearing would increase incentives for jury tampering. While verdict finality is of great importance, this Court should determine whether the final verdict was an honest verdict, a verdict worth maintaining as viable. As the New Jersey Appellate Division has stated, "A verdict of eleven jurors, with the vote of the twelfth coerced rather than convinced, is no verdict at all." New Jersey v. Vergilio, 161 N.J. Super. 648, 678 (App. Div. 1993).

  Mr. Lakhani's request for a hearing should be granted.

13

**Point 4**

## THE COURT SHOULD EXERCISE LENIENCY BASED ON THE FACTORS IDENTIFIED IN 18 U.S.C. 3553(b)

The draft Presentence Investigation Report ("PSR") sets forth the Court's sentencing options. The statutory maximum term of imprisonment is 67 years. (Draft PSR ¶ 170) The guidelines range is life. (Draft PSR ¶ 171) Defendant Lakhani respectfully asks the Court to impose a sentence of time served. (As the Court knows, Mr. Lakhani was arrested on August 12, 2003 and has been in continuous custody at Passaic County Jail for more than two years.)

The Supreme Court recently held in United States v. Booker, 125 S. Ct. 738 (2005) that: (1) judicial fact-finding in support of a Sentencing Guidelines increase violates the defendant's Sixth Amendment right to a jury trial, 125 S. Ct. at 756; (2) the Guidelines are not mandatory, id. at 764; and (3) the sentencing court must take into account the factors set forth at 18 U.S.C. § 3553(a) (including, but not limited to, the Guidelines), id. at 764-65.

While the Guidelines remain relevant, they are now only one of many sentencing factors set forth in 18 U.S.C. §3553(a). Section 3553(a) provides that in determining the applicable sentence, the Court shall consider:

> The nature and circumstances of the offense and the history and characteristics of the defendant [§3553(a)(1)]

14

The need for the sentence imposed:

> To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [§3553(a)(2)(A)];
>
> To afford adequate deterrence to criminal conduct [§3553(a)(2)(B)];
>
> To protect the public from further crimes of the defendant [§3553(a)(2)(C)]; and
>
> To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [§3553(a)(2)(D)];

The kinds of sentences available [§3553(a)(3)];

The kinds of sentence and the sentencing range established in the Federal Sentencing Guidelines [§3553(a)(4)(A-B)];

Any pertinent policy statement issued by the Sentencing Commission [§3553(a)(5)];

The need to avoid unwarranted sentence disparity [§3553(a)(6)]; and

The need to provide restitution to any victims [§3553(a)(7)].

Pursuant to Rule 32(i)(4)(A) of the Federal Rules of Criminal Procedure, defense counsel and Mr. Lakhani request the opportunity to address the Court with respect to these factors at the sentencing hearing.

In the meantime, Mr. Lakhani submits the following for the Court's consideration: Attached as Exhibit 3 is a letter from Mr. Lakhani. Additionally, attached as Exhibits 4 and 5 are letters from his wife Kusum and his son Sanjay, respectively. Also attached are Exhibit 6-22, letters from extended family members, friends, business associates, and community leaders. Finally, enclosed as Exhibit 23 is portfolio about the Lakhani family prepared for sentencing by Kusum Lakhani.

This Court has the opportunity and obligation to fashion a "reasonable" sentence based on all of the information contained in the PSR and to be adduced at the sentencing hearing. At the conclusion of the sentencing hearing, defense counsel will ask the Court to impose a sentence of time served.

### BOP Designation

Based on Mr. Lakhani's recent poor medical history (draft PSR ¶¶ 154-58), much of which is known to the Court from direct reports by Mr. Lakhani's treating physician during trial, we will ask the Court at sentencing to recommend to the Bureau of Prisons that Mr. Lakhani be designated to a facility, perhaps a prison hospital, capable of handing effectively and humanely his deteriorating condition.

## **CONCLUSION**

For the above-stated reasons, as well as the record in the case, Defendant Hemant Lakhani asks this Court either to dismiss the Superseding Indictment or enter a judgment of acquittal or order a new trial. Failing that, Defendant Lakhani asks this Court to exercise leniency at sentencing based on the factors in 18 U.S.C. 3553(b).

Respectfully submitted,

KLINGEMAN TURANO LLC

HENRY E. KLINGEMAN

DATED: August 26, 2005
Madison, New Jersey

17