# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
Martin Luther King, Jr. Federal Building and Courthouse
50 Walnut Street
P.O. Box 419
Newark, New Jersey 07101-0419



William T. Walsh, CLERK

April 19, 2011

H. Lakhani #257530-50 via certified mail
Medical Center for Federal Prisoners
P.O. Box 4000
Springfield, Missouri 65801-4000

Re: USA v. Lakhani; Criminal No. 03-880(KSH)

Dear Mr. Lakhani:

I am in receipt of your letters dated April 7, 2011 and April 11, 2011. Attached to your April 11, 2011 letter was a letter to you from Ralph Florio indicating that all transcripts were sent to your attorney, which was in fact correct in that all proceedings previously transcribed were sent to Mr. Klingeman. However, the proceeding held on April 26, 2011 was never previously transcribed. Therefore you must order the transcript at the rates set by the Court, which are: $3.65 for a 30 day order, $4.25 for a 14 day order, $4.85 for a 7 day order, and $6.05 for a daily order. Mr. Florio has indicated that a $250.00 deposit would be necessary to process the transcript in question.

Since you no longer have a pending criminal case, the transcript can not be paid for by the Court, without authorization from the judge.

Per your request, I am again enclosing the motion filed by Mr. Klingeman on March 12, 2004 along with the brief in support of that motion.

Sincerely,

Michael F. Rivera,
In-Court Supervisor, USDC

cc: Hon. Katharine S. Hayden, USDJ
     Ralph Florio, Official Court Reporter

HENRY E. KLINGEMAN, ESQ. (HK 6007)
Klingeman Turano LLC
230 Main Street, 2nd Floor
Madison, NJ 07940                                    **Document Electronically Filed**
TEL 973-236-0114
FAX 973-236-0012
EMAIL hek@ktlawyers.com
Attorney for Defendant HEMANT LAKHANI

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 03-880 (KSH) |
| | : | |
| v. | : | Hon. Katharine S. Hayden |
| | : | |
| HEMANT LAKHANI | : | NOTICE OF MOTION |

TO:   AUSA JEFFREY D. CLARK
      AUSA BRIAN R. HOWE
      U.S. Attorney's Office
      970 Broad Street
      Newark, NJ 07102
      Attorneys for
      UNITED STATES OF AMERICA

PLEASE TAKE NOTICE that on Monday, April 26, 2004, at 9:30 a.m., or as soon thereafter as counsel may be heard, Defendant HEMANT LAKHANI will move before the Honorable Katharine S. Hayden, Judge, United States District Court, United States Post Office and Courthouse, Courtroom 5, Federal Square, Newark, New Jersey for an Order:   (1) requiring the Government to provide relevant information about the person identified in the Indictment as "Cooperating Witness"; (2) requiring the Government to provide additional discovery pursuant to Fed. R. Crim. P. 16, the Court's standing Order for Discovery and Inspection, and Fed. R. Evid. 404(b); and (3) striking as surplusage the alleged alias from the Indictment, pursuant to Fed. R. Crim. P. 7(d).

**Document Electronically Filed**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 03-880 (KSH) |
| | : | |
| v. | : | Hon. Katharine S. Hayden |
| | : | |
| HEMANT LAKHANI | : | Hearing Date: April 26, 2004 |

---

## BRIEF IN SUPPORT OF DEFENDANT
## HEMANT LAKHANI'S PRETRIAL MOTIONS

---

Henry E. Klingeman, Esq.
KLINGEMAN TURANO LLC
230 Main Street, 2nd Floor
Madison, NJ 07940
(973) 236-0010

On the Brief:

Henry E. Klingeman, Esq.
Karin S. Riecker, Esq.

## Table of Contents

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 6

LEGAL ARGUMENT

  POINT I ......................................................................................................................... 12
    THE GOVERNMENT MUST DISCLOSE THE CW'S IDENTITY AND
    OTHER INFORMATION RELEVANT TO THE DEFENSE

  POINT II ........................................................................................................................ 21
    DEFENDANT LAKHANI NEEDS ADDITIONAL DISCOVERY TO
    DEFEND HIMSELF

  POINT III ....................................................................................................................... 24
    ALL REFERENCES TO MR. LAKHANI'S ALLEGED ALIAS SHOULD
    BE REDACTED FROM THE INDICTMENT AS SURPLUSAGE

CONCLUSION ............................................................................................................. 25

## Table of Authorities

**Cases**

Brady v. Maryland, 373 U.S. 83 (1963) .................................................................. 20, 21, 23

Giglio v. United States, 405 U.S. 150(1972) ...................................................... 5, 20, 21, 23

Jacobson v. United States, 503 U.S. 540 (1992)...................................................... 3, 4, 14, 15

Matthews v. United States, 485 U.S. 58 (1988)................................................................ 14

Roviaro v. United States, 353 U.S. 53 (1957) ......................................... 5, 12, 13, 18, 19, 22

Sherman v. United States, 356 U.S. 369 (1958) ................................................................ 13

Sorrells v. United States, 287 U.S. 435 (1932)................................................................. 3,13

United States v. Baker, 1990 WL 107874 (E.D. Pa. July 23, 1990)................................. 24

United States v. Bibbey, 735 F.2d 619 (1st Cir. 1984)....................................................... 17

United States v. Fedroff, 874 F.2d 174 (3rd Cir. 1989)...................................................... 14

United States v. Gambino, 788 F.2d 938 (3rd Cir. 1986) ................................................. 14, 15

United States v. Jiles, 658 F.2d 194 (3rd Cir. 1981)....................................................... 17, 19

United States v. Martinez, 922 F.2d 914 (1st Cir. 1991)..................................................... 17

United States v. Nwene, 20 F.Supp.2d 716 (D.N.J. 1998) ................................................ 24

United States v. Persico, 621 F.Supp. 842 (D.C.N.Y. 1985)............................................. 24

United States v. Silva, 580 F.2d 144 (5th Cir. 1978)......................................................... 19

United States v. Starusko, 729 F.2d 256 (3rd Cir. 1984).................................................... 20

United States v. Twigg, 588 F.2d 373 (3rd Cir. 1978) .................................................... 13, 16

**Rules**

Fed.R.Crim.P. 16 .......................................................................................................... 5, 21

Fed.R.Evid.P. 16(a)(1)...................................................................................................... 23

Fed.R.Crim.P. 16(a)(1)(B) ................................................................................................. 15

Fed.R.Crim.P 404(b)................................................................................................. 5, 15, 21

Fed.R.Crim.P. 7(d)...............................................................................................24

**Statutes**

18 U.S.C.. § 3500...............................................................................................21, 23

## PRELIMINARY STATEMENT

The Government has alleged that Hemant Lakhani attempted to sell a surface-to-air missile to a Cooperating Witness ("CW") posing as a Somali terrorist intent on shooting down American airplanes in the United States. Even if the Government allegations are true, this prosecution is fatally flawed.

Hemant Lakhani had never been involved in illegal arms trafficking before this investigation commenced. If the Government had not provided the idea, the buyer and the seller, and the financial encouragement, then Mr. Lakhani would have never been involved in this scheme. Consequently, Mr. Lakhani was entrapped by the Government and is thus not guilty of the crimes charged in the Indictment.

Mr. Lakhani is charged in the Indictment with one count of attempting to provide material support to terrorists; one count of unlawful brokering of foreign defense articles; two counts of money laundering; and one count of attempting to import merchandise into the U.S. by means of false statements; plus three counts of forfeiture corresponding to payments made by the CW to foreign bank accounts allegedly for Mr. Lakhani's benefit.

Given the sensational nature of the allegations, it is important to remember what the case is <u>not</u> about.

U.S. Attorney General John Ashcroft announced, in response to the Indictment:

> The Department of Justice is committed, through its coordinated law enforcement activities, to thwarting terrorist plots that threaten the lives of innocent Americans[.] We remain vigilant in our pursuit to detect, disrupt and dismantle terrorist plots affecting our country.

(Dec. 18, 2003 U.S. Dep't of Justice News Release)

(http://www.njusao.org/files/lakh1218_r.htm)

1

The only plot thwarted, detected, disrupted, and dismantled by the Government here was one of its own invention.  The entire "plot" constituting the Government's case was conceived, planned, and executed by Government agents.  The CW posed as an arms purchaser and government agents from the Russian Federal Police posed as arms sellers. There was never a real terrorist plot.  There was never a real missile obtained by Mr. Lakhani and brought by him to the United States. To the contrary, the Government constructed a fake missile, the Government displayed it to Mr. Lakhani in front of hidden video cameras, and the Government brought it to the U.S. for use in the investigation. There was never any risk posed to America, the American people, or anyone else by Hemant Lakhani at any time either before or during this investigation.

John P. Torres, Special Agent in Charge of U.S. Immigration and Customs Enforcement in Newark, stated after indictment:

> The arrest and indictment of Mr. Lakhani sends a clear
> message that law enforcement worldwide remains vigilant
> to preventing terrorist attacks in the United States and
> abroad.

(Dec. 18, 2003 U.S. Dep't of Justice News Release)

(http://www.njusao.org/files/lakh1218_r.htm)

Again, the only terrorist attack prevented here was a fictional plot conceived by the Government to entrap Mr. Lakhani.  The Government "foiled" a conspiracy entirely of its own creation, that would never have been either initiated or consummated had the CW not induced Mr. Lakhani to participate in the deal.  There was no terrorist group, no terror plot, no missile, no terrorist buyer, and no arms-trafficking seller.  Mr. Lakhani was

the middleman surrounded on all sides by Government agents in a transaction orchestrated for the sole purpose of arresting him.

The Government's exaggerated characterization of its own success here masks a significant reality:  If the Government had not entreated Mr. Lakhani to become involved with its Cooperating Witness, then he never would have been involved in illegal arms activity.  Looked at another way, the War on Terror is real, worthy, and necessary; investigating and prosecuting Mr. Lakhani does nothing to further the cause.  Instead, this is a classic case of entrapment that fits squarely within the precedents set by the U.S. Supreme Court and the Third Circuit Court of Appeals.

> In their zeal to enforce the law, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute.

Sorrells v. United States, 287 U.S. 435, 442 (1932).

Did the Government originate the criminal design here?  Yes.  Was Mr. Lakhani predisposed to commit the crimes charged?  No.  Did the Government induce him to participate solely for the purpose of prosecuting him?  Yes.

At trial, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." Jacobson v. United States, 503 U.S. 540, 548-49 (1992).  "[T]hat the accused must be predisposed prior to contact with law enforcement officers is ... firmly established." Id. at 549 n.2 (emphasis added).

The proof of predisposition must establish an inclination to commit illegal acts. The discovery indicates Mr. Lakhani may have been attempting to involve himself in

3

international arms trading beginning less than 5 years ago; specifically, Mr. Lakhani participated in one completed legal transaction that resulted in an armored vehicle being sold by a Ukrainian-licensed company to the government of Angola. "[T]his is scant if any proof of [defendant]'s predisposition to commit an illegal act, the criminal character of which a defendant is presumed to know." Id. at 550. In fact, "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." Id.

Additionally, the Government has publicly pointed to statements allegedly made by Mr. Lakhani in recorded conversation with the Cooperating Witness as evidence of his motive to harm the United States and support al Qaeda-style terrorism. (Dec. 18, 2003 U.S. Dep't of Justice News Release) (http://www.njusao.org/files/lakh1218_r.htm); (Aug. 13, 2003 U.S. Dep't of Justice News Release) (http://www.njusao.org/files/la0813_r.htm) Without conceding that Mr. Lakhani made the statements attributed to him, they – even when combined with his involvement in legal arms transactions – are insufficient to establish a predisposition to commit the crimes alleged.

> [P]roof that petitioner engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing.

Jacobson, 503 U.S. at 551, n.3

> When the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene.

Id. at 553-54.

4

All discovery requested by Mr. Lakhani in this motion – pursuant to Rule 16 of the Federal Rules of Criminal Procedures, Rule 404(b) of the Federal Rules of Evidence, or the Court's standing Order for Discovery and Inspection, the Jencks Act, <u>Giglio v. United States</u>, 405 U.S. 150 (1972), or <u>Roviaro v. United States</u>, 353 U.S. 53 (1957) – pertains directly to Mr. Lakhani's ability to investigate and substantiate the defense of entrapment. Given the complexity of the case – based on investigation that spanned almost two years and three continents and generated nearly 200 recorded conversations in the languages of Hindi and Urdu -- the Court should require immediate disclosure of the information requested to ensure a fair trial.

## STATEMENT OF FACTS

Hemant Lakhani is a 69 year-old practicing Hindu born in India who has been a British subject living in London for more than 40 years. He has made his living first as a lawyer and, for most of his life, as an importer of women's clothing.

Mr. Lakhani is not a terrorist; he is not an international arms dealer; and he does not have a history of illegal arms trafficking. Mr. Lakhani has no history of involvement in politics, Muslim extremism, or anti-American activities. Finally, he is not associated with any terrorist group, including al-Qaeda or anyone in Somalia. Several years ago, Mr. Lakhani assisted the Angolan government in purchasing an armored vehicle from a state-licensed Ukrainian company in a legal transaction, not unlike similar transactions conducted by American and Russian companies every day with the approval of their respective governments.

In this case, Mr. Lakhani was set up by an unscrupulous, paid informant of dubious background, behind whom the Government has placed its faith, credibility, and financial support. Mr. Lakhani was induced by the Government to participate in the scheme, and convinced to assist the Government's informant by the promise of a huge profit.

The indictment alleges numerous conversations and meetings between Mr. Lakhani and the CW in furtherance of the scheme. (Ind. ¶ 4 at 2) Indeed, the government has produced nearly 150 draft transcriptions of tape recordings of telephone

6

conversations between the CW and Mr. Lakhani from December 2001 to August 2003.[1]

Of those conversations, all but a handful were initiated by the CW.

The initial conversations are highly relevant to the entrapment issue of predisposition, i.e., was Mr. Lakhani predisposed to involve himself in a scheme of this nature.

While the indictment alleges that contact between the CW and Mr. Lakhani began in December 2001, the first recorded conversation between the CW and Mr. Lakhani on December 19, 2001 was clearly not the first contact between the two. When Mr. Lakhani answers the call, the CW simply states, "Greetings, Sir!," to which Mr. Lakhani immediately responds, "Hello brother Haji, greetings. How are you?" (NKCM 44692 at 1)[2] Mr. Lakhani advises the CW that he had called the other day and spoken with CW's daughter. (NKCM 44692 at 1) Moreover, it is evident from the conversation that they had already begun business discussions, as Mr. Lakhani indicates that he will bring the CW a copy of the "seller's documents" and the "shopping list" when he comes, and the CW asks Mr. Lakhani about "the stuff from Ukraine." (NKCM 44692 at 1-2) Thus, it is evident that not only did Mr. Lakhani and the CW already know each other, but the CW had already introduced the idea of purchasing weapons via Mr. Lakhani.

Thus, in the context of Mr. Lakhani's entrapment defense, it is imperative for the Government to disclose and for the defense to know the identity and background of the CW, what information the Government and/or the CW had about Mr. Lakhani prior to the

---

[1] The defense has conducted a preliminary review of transcripts received over the past month. According to the Government, there are additional draft transcripts still in process, including transcripts of meetings between Mr. Lakhani, the CW, and undercover Russian FSB agents in July 2003. The recorded conversations themselves are in Hindi and Urdu. While Mr. Lakhani has had the opportunity to listen to the tapes, his non-Hindi-speaking, non-Urdu-speaking attorneys are confined to the transcripts that contain many "unintelligible" and otherwise ambiguous passages at key points.

[2] The "NKCM" designation followed by a number refers to the Government's tape indexing system.

investigation, how the CW and Mr. Lakhani first became associated, and the details of how the weapons sale was raised and discussed with Mr. Lakhani prior to December 19, 2001. With respect to the first prong of entrapment – predisposition – this information will help establish the fact that the Government conceived and initiated the scheme. With respect to the second prong of entrapment – inducement – this information will shed light on the representations and promises made by the CW to convince Mr. Lakhani to participate.

The indictment further alleges that the scheme included the purchase of a "sample" missile by the CW on behalf of the purported terrorist group, discussions between Mr. Lakhani and the CW regarding the illegal nature of the venture, and the preparation of false shipping documents associated with the importation of the sample missile. (Ind. ¶¶ 9-11 at 3-4, ¶¶13-14 at 5, ¶17 at 6) During the course of their dealings, the CW apparently felt compelled to ensure Mr. Lakhani's understanding of the illegal nature of the transaction. For example, during the second face-to-face meeting between Mr. Lakhani and the CW, on April 25, 2002, the CW tells Mr. Lakhani, "You know that this is not a legal business." (NKCM 45256 Part I at 21) Mr. Lakhani's response is unintelligible. (NKCM 45256 Part I at 21) Later, on the same tape, the CW again states, "when it comes to legality then these people become concerned. . ." (NKCM 45256 Part I at 33) Again, Mr. Lakhani's response is unintelligible. (NKCM 45256 Part I at 33) Thus, it is not self-evident from a review of the transcripts that Mr. Lakhani was aware of the illegal nature of the CW's request from the beginning. This again leads back to the importance to the defendant of getting discovery from the Government regarding the

earlier, unrecorded, contacts between Mr. Lakhani and the CW (not to mention audible tapes and accurate translations for the recorded contacts).

The indictment further alleges that the CW traveled with Mr. Lakhani to Russia, ostensibly to meet with the suppliers of the missiles. (Ind.¶15 at 5-6) Mr. Lakhani and the CW actually met with Russian law enforcement officials that had "infiltrated" the alleged missile deal, according to the indictment. (Ind. ¶15 at 6) (Given that the Government orchestrated the arms deal, it is hard to see how the Government could be said to have "infiltrated" its own undercover operation.) The indictment further alleges that, following importation of the sample missile (actually an unarmed replica), Mr. Lakhani met with the CW to negotiate the sale of additional missiles. (Ind. ¶18 at 7) Finally, Mr. Lakhani is alleged to have advised the CW that the missiles could be used in terrorist attacks against commercial aircraft in the United States. (Ind. ¶18 at 7)

What is not clear from the indictment, but is abundantly clear from the transcripts, is that the CW was the very active and eager promoter of the transaction charged and repeatedly prodded, encouraged, enticed and induced Mr. Lakhani to consummate the missile deal. For example, Mr. Lakhani repeatedly advised the CW that he did not know how to get the merchandise into the United States, and CW repeatedly advised Mr. Lakhani that he would take care of it. (NKCM 45256 Part I at 29, 43, 45) Mr. Lahkani repeatedly asked the CW for instructions on how to proceed: "You must let me know what is to be done. How to handle the stuff? How to send it or how to invoice it etc. Tell me what to do?" (NKCM 45624 at 6) Thus, there is evidence to suggest that Mr. Lakhani simply could not have ever completed the transaction without the Government on both ends of the deal acting as buyer and seller.

9

The transcripts also suggest that, not only was Mr. Lakhani incapable of consummating the deal without the assistance of a Government buyer, a Government seller and a fake missile, but that he would not have even attempted to complete the transaction but for the continual enticing and prodding by the CW. The CW repeatedly assured Mr. Lakhani how much money there was to be made, if he could only supply the first sample missile. (NKCM 45256 Part 2 at 10, "there is going to be so much money that the money will be falling down.;" at 31, "if one doesn't make at least two to two and half million dollars in a year then …") (NKCM 45625 at 4, "Once we complete the first deal, there will be so many customers lined up that you won't believe.") (NKCM 46355 at 7, "You can't even imagine. There is so much money.") (NKCM 46838 at 4, "if this job is done then there is no limit") (NKCM 46983 at 5, "we can lay our hands on 2-4 million dollars for our own business . . .")

On more than one occasion, Mr. Lakhani indicated that he would be willing to stop the deal, but the CW pushed him forward. For example, on June 13, 2002, Mr. Lakhani asks the CW, "Let me know if it is workable?  If there is any problem, forget it." The CW responds that the deal will be done. (NKCM 45624 at 6)  On October 5, 2002, Mr. Lakhani again tells the CW, "If you don't want to do this business, I don't mind," and again, "Let me know what you want to do about this.  Let me know also if you have any problems.  We can forget about the whole thing, and I will go on my business." (NKCM 46155 at 3, 4).  In response, the CW implores Mr. Lakhani to continue, "for Heaven's sake . . ." "please don't go anywhere because our business is very serious and you know it." (NKCM 46155 at 3, 5, 7)  The CW then tells Mr. Lakhani that everything is fine, to which Mr. Lakhani replies, "if the job cannot be done, it will be a different

matter." (NKCM 46155 at 7). A few days later, Mr. Lakhani again tells the CW that he can delay or cancel the deal, to which the CW responds, "No, . . . we have worked so much on this." (NKCM 46154 at 5). In November, 2002, it appears once again that Mr. Lakhani is considering abandoning the sale. Though portions of the conversation are unintelligible, Mr. Lakhani tells the CW, "this is a wrong job." (NKCM 46356 at 1) The CW responds by beseeching Mr. Lakhani, "you got to handle it somehow" . . . "you got to get the shipment out of there". . . "please do this any way you can." (NKCM 46356 at 2)

While the defense has only selected a handful of excerpts from the draft transcripts to serve as examples of how Mr. Lakhani was entrapped, there are many more. There is ample evidence in the transcripts and in the information known to date about the investigation that Mr. Lakhani was entrapped and that he would not have participated in the instant transaction but for the repeated enticements promised and pressure exerted by the CW. The CW initiated contact with Mr. Lakhani, repeatedly prompted him with promises of million-dollar profits to get the deal done, provided him with assistance and advice when Mr. Lakhani was unable to perform and, ultimately, when Mr. Lakhani's empty assurances that he could supply missiles went unrealized for over 18 months, the Russian government supplied a fake missile to Mr. Lakhani to sell to the CW.

11

## LEGAL ARGUMENT

### POINT I

**THE GOVERNMENT MUST DISCLOSE
THE CW'S IDENTITY AND OTHER
INFORMATION RELEVANT TO THE DEFENSE**

The sole participant, other than Mr. Lakhani, in this fictitional scheme to supply weapons to a Somali terrorist group, and the driving force behind the alleged scheme, was the Government's Cooperating Witness.  Disclosure of information regarding the CW's identity and background are absolutely essential to Mr. Lakhani's ability to investigate the matter and prepare a defense to the charges.

Under certain circumstances, the Government is permitted to keep the identity of a confidential informant who provided information leading to the investigation and/or arrest of a defendant concealed.  "What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."  Rovario v. United States, 353 U.S. 53, 59 (1957).

The Court in Roviaro did not set forth a fixed rule as to when disclosure is required.  Rather, the Supreme Court directed the lower courts to determine the need for disclosure on a case-by-case basis, balancing "the public interest in protecting the flow of information against the individual's right to prepare his defense." Id. at 62.  The relevant factors in making the determination include, the crime charged, the potential defenses, and the significance of the informer's testimony.  Id.

"Where the disclosure of an informer's identity, or of the contents of his communications, is relevant and helpful to the defense of an accused, or is essential to a

fair determination of a cause, the privilege must give way." Id. at 60-61. The law is clear that under the circumstances present in this case, the identity of the CW, along with the CW's background, knowledge about Mr. Lakhani and prior statements, must be disclosed to the defendant.

At this juncture, Mr. Lakhani intends to assert the defense of entrapment – a defense borne out by the information disclosed to date about the Government investigation of Mr. Lakhani. See Sorrells, 287 U.S. at 451; see also Sherman v. United States, 356 U.S. 369, 375-76 (1958). Mr. Lakhani will also assert a claim of due process violation by virtue of the Government's outrageous conduct in initiating the sale and providing both a buyer and a seller and a fake missile to effectuate the sale, regardless of whether Mr. Lakhani is able to show lack of predisposition. See United States v. Twigg, 588 F.2d 373 (3rd Cir. 1978).

Given the CW's interactions with Mr. Lakhani throughout the course of the investigation, the CW is uniquely crucial to Mr. Lakhani's ability to develop and flesh out these defenses. If the defense of entrapment (or the defense of outrageous government conduct) is at issue, "the essential demands of justice" require that a defendant not be denied the opportunity to prove such defense just because the evidence to sustain such defense may lead to collateral issues "relating to the activities of the officials of the government and to the conduct and purposes of the defendant previous to the alleged offense." Sorrells, 287 U.S. at 451. Thus, the activities of government officials (in this case, the CW) and the known prior conduct and criminal purposes of Mr. Lakhani are highly relevant to the disposition of this case. As such, Mr. Lakhani must be permitted the opportunity to investigate and develop these issues via disclosure of the

CW's identity and background, as well as background information and intelligence known to the Government regarding Mr. Lakhani prior to the instigation of the undercover operation.

The defense of entrapment has two related elements: 1) lack of predisposition on the part of the defendant, and 2) government inducement of the crime. Matthews v. United States, 485 U.S. 58, 63 (1988); United States v. Fedroff, 874 F.2d 174 (3rd Cir. 1989). Where the Government has induced a defendant to break the law and the defense of entrapment is at issue, the prosecution must prove the defendant's predisposition beyond a reasonable doubt. Jacobson, 503 U.S. at 548-49.

In this case, the government, via the CW and the CW alone, initiated contact with Mr. Lakhani, induced Mr. Lakhani to engage in the deal, and further induced him to continue and finalize the transaction when Mr. Lakhani expressed his reluctance or his inability to consummate the deal. The CW will confirm that he initiated contact with Mr. Lakhani and further, will provide details regarding the substance and circumstances of his contacts with Mr. Lakhani, and should shed light on what information the Government possessed that precipitated the sting operation against Mr. Lakhani. The CW is necessary to provide insight and details regarding the initial contact between himself and Mr. Lakhani, particularly those contacts that were not recorded by the Government.[3]

Predisposition is defined as the defendant's inclination to engage in the crime for which he was charged, measured before his initial exposure to government agents, and may be proven in a variety of manners. United States v. Gambino, 788 F.2d 938, 945

---

[3] The recorded conversations were almost all spoken in the languages of Hindi and Urdu. It is defendant's understanding that the CW is assisting in the translations of the recordings. The draft translations produced to date contain numerous "unintelligible" portions, and contain content whose accuracy is disputed by Mr. Lakhani. Consequently, the defense will be seeking its own expert witness to conduct translations of the audio and video recordings.

14

(3rd Cir. 1986). At trial, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." Jacobson, 503 U.S. at 548-49. "[T]hat the accused must be predisposed prior to contact with law enforcement officers is … firmly established." Id. at 549 n.2.

The Government may prove predisposition by showing (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already existing plan on the part of the defendant to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement. Gambino, 788 F.2d at 945.

Based on the information disclosed to the defense to date, the Government will not be able to prove Mr. Lakhani's predisposition to commit the crimes with which he is charged by proof of an existing course of criminal conduct, because Mr. Lakhani has not previously engaged in any criminal conduct. Nor will the Government be able to prove predisposition by an already formed design on the defendant's part, because the plan was wholly planned and initiated by the Government and the CW. To the extent that the Government is in possession of any information evidencing prior criminal conduct or other prior bad acts of Mr. Lakhani, or evidencing a prior design by Mr. Lakhani to engage in an illegal arms transaction, the Government must be compelled to disclose any such evidence at this time. See Fed. R. Crim. P. 16(a)(1)(B); Fed. R.Evid. 404(b); January 9, 2004 Order for Discovery and Inspection ¶¶ 1, 3.

At this time, it appears that proof of Mr. Lakhani's predisposition (or lack thereof) to commit the crime charged may come down solely to Mr. Lakhani's responses to the

15

CW's overtures, particularly at their initial and early meetings. These responses, and the continuing course of conduct, must be analyzed not only by reviewing the literal words contained on the translations of the recorded conversations, but also must be analyzed by reviewing the subtleties of the conversations, such as context, intonation, inflection, facial expression, gestures, etc., which only the participants of the conversation can elaborate and elucidate. Only the CW can shed light on these issues.

Even if Mr. Lakhani's entrapment defense may ultimately fail based upon proof of predisposition, he may nevertheless have a viable defense based upon the Government's complete orchestration of the transaction – the Government initiated contact with Mr. Lakhani, who was not engaged in illegal arms dealing or other illegal activity, and created and posed as a fictitious buyer; the Government actively participated with Mr. Lakhani in the activity charged; the Government implanted the criminal idea in Mr. Lakhani's mind; the Government prodded Mr. Lakhani to continue his participation and provided him with guidance and information, and; when Mr. Lakhani was unable to consummate the transaction on his own, the Russian Government posed as sellers and supplied an unarmed replica of a missile for Mr. Lakhani to sell. See Twigg, 588 F.2d at 381. As in Twigg, the Government not only supplied the necessary ingredients for the crime (in this case, a buyer, a seller and a fake missile), but the Government "conceived and contrived" the crime. Id. at 378.

"This egregious conduct on the part of the government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs." Id. at 381. Fundamental fairness requires that such a prosecution be barred. Id.

16

Because the activity of the CW constitutes the essence of such defense, disclosure of his identity and background is essential to ensuring a fair determination of the case.

Thus, in this case, as in <u>Roviaro</u>, the factors weigh in favor of disclosure. The CW's testimony is crucial to Mr. Lakhani's ability to prepare his defense to the very serious charges against him, because the informer's testimony constitutes the bulk of the evidence against Mr. Lakhani and Mr. Lakhani's defenses of entrapment and outrageous government conduct cannot be fleshed out or confirmed without knowing what the CW has to say. The case against Mr. Lakhani is based upon Mr. Lakhani's interactions with the CW from December, 2001 to August, 2003. During that period, there were more than 150 recorded conversations between Mr. Lakhani and the CW, almost all of which were initiated by the CW and did not involve other witnesses or participants. Thus, the CW was both a participant and a material witness to the activities forming the basis of the charges against Mr. Lakhani. <u>See United States v. Jiles</u>, 658 F.2d 194, 196-97 (3rd Cir. 1981).

The Third Circuit has stated that where "the informant played an active and crucial role in the events underlying the defendant's potential criminal liability. . . . disclosure and production of the informant will in all likelihood be required to ensure a fair trial." <u>Jiles</u>, 658 F.2d at 196-97; <u>see also United States v. Martinez</u>, 922 F.2d 914, 920-21 (1st Cir. 1991) ("[D]isclosure must be forthcoming if 'the government informant was the sole participant, other than the accused, in the transaction charged,' or was 'the only witness in a position to amplify or contradict the testimony of government witnesses.'"), <u>quoting</u>, <u>U.S. v. Bibbey</u>, 735 F.2d 619, 621 (1st Cir. 1984).

17

The fact that many of the conversations were recorded does not dilute the import of the CW as a participant and material witness. The conversations between the CW and Mr. Lakhani were all spoken in the languages of Urdu and Hindi, and will only be decipherable by the fact-finder upon accurate translation. While many of the tapes have been translated and transcribed in draft form, only the CW and Mr. Lakhani can verify the accuracy of the translations, and can provide details regarding context, tone, inflection, body language, movements and mannerisms, facial expressions, and other indirect indications of the true meaning and intent of the spoken words. See Roviaro, 353 U.S. at 64 (only the confidential informant could "controvert, explain or amplify" the government agent's report of a conversation between the defendant and the confidential informant). Indeed, the CW likely will assist the Government in translating and understanding the conversations.

Finally, as in Roviaro, the CW helped to set up the criminal transactions and played a prominent part in them. The CW initiated contact with Mr. Lakhani, solicited him to supply the surface-to-air missile, and pushed Mr. Lakhani every step of the way from December, 2001 until the arrest in August, 2003. There are abundant examples throughout the transcripts produced to date evidencing the CW's prodding of Mr. Lakhani to complete the deal, and repeated promises of the riches to be made together following successful completion of the deal. Additionally, Mr. Lakhani's various offers to abandon the deal were vigorously rejected by the CW. Other than the defendant, only the CW can provide insight into all the relevant circumstances during the course of the prolonged and complex investigation.

18

As such, the CW's testimony is highly relevant to Mr. Lakhani's preparation for the case and possible entrapment and outrageous government conduct defenses. See Roviaro, 353 U.S. at 64. The lower courts following Roviaro have held that, even if the confidential informant was not an active participant or a material witness, disclosure of the confidential informant's identity shall nevertheless be required where a defendant makes a particularized showing of how the information to be ascertained from a confidential informant may be necessary for the defendant to adequately prepare a defense. See, e.g., United States v. Silva, 580 F.2d 144, 147 (5th Cir. 1978) (disclosure of confidential informant required because might refute testimony of undercover agent and further defense of mistaken identity or, alternatively, enable defendant to develop theory that he was framed).

Defendant's need must be weighed against the Government's interest in non-disclosure. A government's general policy that releasing the identity of an informant will deter others from cooperating has been deemed an insufficient reason to uphold the privilege in the face of a showing of need by the defendant. Jiles, 658 F.2d at 198 ("this is not a case in which the Government argues, on general policy bases, that releasing the identity of the informant will deter future witnesses from stepping forward"). Rather, there must be a particularized showing by the Government of a need for secrecy, that must be balanced against the defendant's need for disclosure. See Jiles, 658 F.2d at 198 (apparent "very high risk of physical harm to the particular informant involved" required close scrutiny of defendant's proffered need for disclosure). There is no indication from Mr. Lakhani's course of action throughout the investigation that disclosure of the CW's identity might result in danger or injury to the CW from Mr. Lakhani.

19

Finally, whether or not the Government intends to call the CW to testify at trial, the identity of the CW, along with the other information requested regarding the CW, should be disclosed at this time to allow the defendant adequate time to conduct his own investigation and prepare a defense.  This case encompasses a Government investigation that extended over 18 months, involves activities in multiple countries (e.g., United States, England, Russia, Ukraine, India), and includes over 150 recorded conversations, primarily in the languages of Hindi and Urdu.  The standard obligation for the government to disclose information shortly before the trial commences will not be sufficient to ensure a fair trial and due process of law in the circumstances of this case. Moreover, the Government should be required to disclose any and all potentially exculpatory information at this time pursuant to Brady v. Maryland, 373 U.S. 83 (1963), including impeachment material relating to the CW, whose reliability and credibility could be determinative of Mr. Lakhani's guilt or innocence at trial.  See Giglio v. United States, 405 U.S. 150, 154 (1972); see also United States v. Starusko, 729 F.2d 256, 263 (3rd Cir. 1984).

## POINT II

### DEFENDANT LAKHANI NEEDS
### ADDITIONAL DISCOVERY TO DEFEND HIMSELF

In addition to the particular information requested in Point I by Mr. Lakhani regarding the CW, Mr. Lakhani also requests early disclosure of the discovery required pursuant to Fed. R. Crim. Proc. 16 and the Court's January 9, 2004 Order for Discovery and Inspection (hereinafter "Discovery Order") requiring the disclosure of all Rule 16 discovery, along with other evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, Fed. R. Evid. 404(b), and all statements and impeachment evidence pursuant to the Jencks Act and Giglio v. United States, 405 U.S. 150 (1972), for the purpose of substantiating his defense of entrapment and outrageous government conduct.

As set forth above, a pivotal aspect of Mr. Lakhani's entrapment defense will be what, if any, proof of predisposition exists. Thus, in order to adequately prepare Mr. Lakhani's defense and ensure a fair trial of the matter, defendant seeks immediate disclosure of the following information:

1. All evidence of other crimes, wrongs or acts by Mr. Lakhani that the Government intends to introduce at trial.

2. The source and content of any information known to the Government regarding Mr. Lakhani prior to the commencement of the investigation leading to the instant indictment.

3. The substance and circumstances of any and all contacts between the CW and Mr. Lakhani prior to the first recorded conversation of December 19, 2001.

4. Transcribed translations of any and all recorded contacts between the CW and Mr. Lakhani that have not yet been produced.

5. The substance and circumstances of any and all unrecorded contacts between the CW and Mr. Lakhani.

6.      Any and all statements made by Yehuda Abraham, Hamed (from the Complaint), Zuber and any other alleged participants in the alleged scheme, related to Mr. Lakhani.

7.      Whether there were any informers other than the CW who provided the government with information at any time with respect to Mr. Lakhani.

8.      If there were any such informers, the identity of each such informer, the information provided by each such informer, and the scope of each such informer's activities.

9.      The circumstances and information that led to the involvement of the Russian FSB (Federal Security Police) in the investigation of Mr. Lakhani.

10.     Any and all information provided to the Government by the Russian FSB related to or in furtherance of the investigation of Mr. Lakhani.

Item number one (1), evidence of other crimes, wrongs or bad acts by Mr. Lahkani, must be disclosed pursuant to the Court's Discovery Order, ¶ 3. Because any such evidence may provide evidence of predisposition by Mr. Lakhani, it impacts directly upon Mr. Lakhani's ability to formulate and sustain his entrapment defense and must be disclosed immediately.

Items number two (2) to five (5), regarding information known to the Government about Mr. Lakhani and the contacts between Mr. Lakhani and the CW, are discoverable pursuant to Rule 16 (a)(1), the Court's Discovery Order, ¶¶ 1(a), 1(f), the Jencks Act and Giglio v. U.S., 405 U.S. 150 (1972). The information requested relates directly to the issue of whether and to what extent Mr. Lakhani may have been predisposed to commit the crimes alleged and, as such, must be disclosed immediately.

Item number six (6), the statements of unindicted co-conspirators,

Items number seven (7) and eight (8) are discoverable pursuant to Roviaro v. U.S., 353 U.S. 53 (1957), see Point I, and must be disclosed immediately.

22

Items number nine (9) and ten (10), relating to the involvement of and information obtained by the Russian FSB, is discoverable pursuant to the Court's Discovery Order, ¶¶ 1, 4, the Jencks Act and Giglio v. U.S., 405 U.S. 150 (1972), and pursuant to Brady v. Maryland, 373 U.S. 83 (1963) to the extent that such information supports Mr. Lakhani's entrapment defense.

Moreover, to the extent that any of the information sought by defendant is favorable to the defendant, particularly in light of his entrapment defense, it must be disclosed immediately pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and the Court's Discovery Order, ¶ 1(f).

## POINT III

### ALL REFERENCES TO MR. LAKHANI'S
### ALLEGED ALIAS SHOULD BE REDACTED
### FROM THE INDICTMENT AS SURPLUSAGE

Pursuant to Fed. R. Crim. Proc. 7(d), the court may strike surplusage from the indictment upon the defendant's motion. The indictment against Mr. Lakhani includes reference to an alias, "Hemad Lakhani." The purported alias is almost identical to Mr. Lakhani's real name. There is no allegation in the Indictment that expressly relates to this alleged alias. It may be a typographical error seen on one or more documents seized by the Government or a mispronunciation by a witness, than an alternative name by which Mr. Lakhani has been known.

The court should redact any and all references to the alias in the indictment and the caption prior to presentation of the indictment to the jury. Fed. R. Crim. Proc. 7(d); see also, United States v. Nwene, 20 F.Supp.2d 716, 722-23 (D.N.J. 1998), aff'd, 213 F.3d 629 (3rd Cir. 2000). Cf. United States v. Baker, 1990 WL 107874 (E.D. Pa. July 23, 1990), aff'd, 928 F.2d 1131 (3rd Cir. 1991) (the use of aliases in an indictment is permissible if it is needed to connect the defendant to the acts alleged in the indictment); United States v. Persico, 621 F.Supp. 842, 861 (D.C.N.Y. 1985) (same).

The "Hemad Lakhani" alias is neither relevant nor material to the allegations against Mr. Lakhani. The inclusion of an alias has negative connotations, and may imply that the defendant sought to hide his identity or engaged in prior criminal activity. As such, its inclusion is potentially prejudicial to Mr. Lakhani and should be redacted.

24

## CONCLUSION

For the foregoing reasons, defendant Lakhani's motions for disclosure of the identity of the CW and other relevant information regarding the CW, specified discovery pursuant to Rule 16, and to strike all references to the alias "Hemad Lakhani" from the indictment should be granted.

Respectfully submitted,

KLINGEMAN TURANO LLC


/s/ Henry E. Klingeman (HK 6007)
Klingeman Turano LLC
230 Main Street, 2nd Floor
Madison, NJ 07940
TEL 973-236-0114
FAX 973-236-0012
EMAIL hek@ktlawyers.com



Dated: March 12, 2004
       Madison, New Jersey

25