dt:- 10H OCT 011

From: H Lakhani esq,
Reg: 257530-50
     H.C.F.P.
     4000- Spring Field.
     H.O. 65801

To: Michael F Rivera. Esq
    In- Court Supervisor,
    U.S.D.C., The State 4- New Jersey
    Newark. NJ

Re: U.S.A v. Lakhani Crim. 03-880- (KSH)

Dear Mr Rivera,
                Further to my earlier letter, I would
like to illustrate in greater details about the origin and
History 4 the contract 30/12/1 (Exhibit J-255) for your records.
             In his dramatic speech 4 17th February 05,
Klingman made a reference about " Chain 4- custody and
pretended that He did't nothing about this document Until Today.
when He was given it for the First Time
                THe said document was seized for the
first Time from my London Home on the 12th Aug. 03 (the day of
my Arrest in NJ] and simultaneously a copy 4 the same to-gether
with other documents supplied by Libera CO, [Herein known
as Party A ] were also seized by the Scotland Yard official
from Raja's Apartment in London. [ see attached Search warrant Copy]
There is also a properly documented List prepared by the
Government as a part of discovery documents pursuant Rule 16(a)1
which also included contract 30/12/1 which I received from time To Time.

Additionally, I have in my possession copies q-attorney-client-communication, minutes q the meeting on this issue including his suggestion that I should try to request my London solicitor to write to Sirgie Pytaak, Liberia co, for the recovery q-my deposit of 2500 dollars. All these discussions took place some 12 months before my trial began in Jan. 05.

Liar No 2.    [ COURT-TRANSCRIPT 737078 - 18th Feb 05 ]

Howe, A.U.S.A who made the opening dialogue in his direct Examination, telling his witness, to tell the Jury about this document and told the court that, this document was given to him by his witness (Okhdoski- F.S.B. Moscow) before He went on the stand to testify and further told the court that the said document "Emerged" from F.S.B Moscow, through it's independent investigation on Lakhani. A complete pack 4 Lies — because He forgot that when He went to London on 24th Feb. 04 with his former Boss, Mr Clark and the team A FBI — wrote in presence 4 Raja's solicitor, FBI presented to Raja certain documents for his varification. (writ item No TIR/36—, which contained contract 30/12/1. as well [ see Form 302(a) CRIM. 312.H. NK.10723 ] an 8 page statement signed by Raja on 24th Feb 2004.

Liar No 3.    CRIM. 312.H. NK. 10723

The Full Team A FBI — in charge q this investigation, who went to London with set of documents for Raja's varification, prepared in presence of Howe, Clark and Raja's solicitor Form 302(a) 8 pages and Raja confirmed and signed it. As a Law-enforcement, they are expected to tell the Truth —. but at the Trial they choose to remain Silent and allowed Howe, his witness (FSB-Moscow) and Klingman to tell Lies, to create false impression and to prejudice the defendant, For Klingman "Facts And Reality Mean Nothing And There is No Road Too Low For Him to Slither upon." I await your reply

Encl. 2.                                   Respectfully Submitted. H. Lakhani.

Q. Now, in addition to speaking to the Constables, the British law enforcement on August 12 and August 13, 2003, you have spoken previously to members of American law enforcement, yes?
A. Previous to August 12.
Q. Previously to today. Before today, you have spoken to them?
A. Yes, I have.
Q. You've spoken to American law enforcement officers?
A. Yes, sir. Yes, sir.
Q. Specifically on February 24, 2004? In other words, a little less than a year ago, you met in London with members of the FBI and the U.S. Attorney's office?
A. Yes, sir.
Q. And your Solicitor was present?
A. Yes.
Q. When I say Solicitor I am talking about your lawyer?
A. Yes.
Q. And present was Mr. Howe who asked you questions this morning, right?
A. Yes, sir.
Q. And special agents Tareco from the Federal Bureau of Investigation. Left side front row?
A. Yes, sir.
Q. And Special Agent Settembrino from the FBI sitting-- who is sitting directly to, if I could ask Special Settembrino to stand for the record?
Thank you I appreciate that.
A. Yes.
Q. I am terrible at this time. Also present was another Assistant U.S. Attorney Mr. Clark who is not here?
A. Yes, sir.
Q. Okay. Was there anyone else there?
A. My lawyer was there.
Q. We got that, your lawyer, right.
A. Yes.
Q. You?
A. Myself.
Q. And prior to that interview beginning you were given a written agreement that was to be executed between yourself and your lawyer and the representatives of the United States federal law enforcement agencies, correct?
A. Ah, ah. Yeah.
Q. And that agreement was dated February 24, 2004, right?
A. Yes.
Q. I'll show it to you.
A. Yes, okay. Go ahead.
Q. You agree with me?
A. Yes, sir.
Q. And it is a two page agreement-- excuse me a three page agreement, right?
A. Yes, sir.
Q. And it includes the terms and conditions that govern the interview that you were giving on February 24, 2004, right?
A. Yes.
Q. And it was carefully negotiated by your lawyer?
A. Yes.
Q. And certain changes to it were made in-- handwritten and initialed?
A. Yes.
Q. Then you had a chance to read it before you signed it?
A. Yes, sir.
Q. And of course you had a chance to talk to your lawyer privately before you decided to go ahead with the interview, right?
A. Yes.
Q. And then you signed it?
A. Yes, sir.
Q. Right?
A. Yes.
Q. And you dated it?
A. Yes.
Q. I'll show you it (handing). This is the whole thing. Do you recognize it?
A. Yes, sir.

Q. Now, the agreement, well you knew the purpose of the interview was to learn more about the Lakhani missile deal, right?
A. Yes, sir.
Q. And you knew that the law enforcement agents from the United States had travelled all the way from America to the United Kingdom for the purpose of interviewing you possibly, among other things?
A. That's right.
Q. So you knew they were there for a very important purpose?
A. That's right.
Q. And you knew that your number one obligation on that occasion was to tell the truth?
A. That's right.
Q. And, in fact, the agreement says, that United States wouldn't use the statements that you made that day against you directly in any prosecution provided you're truthful, right?
A. Yes.
Q. And the only prosecution that could result directly from your statements would be for false statements, perjury, or obstruction of justice?
A. That's right.
Q. And you understand what a false statement is?
A. That's right.
Q. It is a lie?
A. That's right.
Q. Perjury is a lie under oath?
A. Sure.
Q. And obstruction of justice is telling something that's false to law enforcement to essentially throw them off the trail, right?
A. That's right, ah, ah.
Q. And you understood that before you started answering any questions?
A. Ah, ah.
Q. And you answered a lot of questions?
A. Right.
Q. How long was that interview?
A. I think over a day.
Q. What?
A. A day or two.
Q. A day or two?
A. Yes.
Q. Was anybody on the government's side taking notes during the interview?
A. I don't remember.
Q. Well, did you observe either the FBI agents, Special Agent Settembrino or Tareco taking notes during the interview?
A. I don't recall.
Q. Has anyone showed you any notes or any reports that purport to summarize what you've told them?
A. I don't exactly remember right now.
Q. You don't remember being shown anything like that?
A. I don't remember right now. I may have been shown. I don't recall.
Q. I am sorry?
A. I don't recall.
Q. Okay. Is it possible you've been shown notes or a report?
A. I don't recall.
Q. Now you told them, meaning the agents, that you first met Lakhani at the end of '99, right?
A. Yes.
Q. And you told them his name was Hemant H-E-M-A-N-T, right?
A. Right.
Q. And you are Indian by birth?
A. Yes, sir.
Q. And that continuing your nationality?
A. That's right.
Q. You are not a British subject?
A. Yes.

IN THE INNER LONDON COMMISSION AREA

Bow Street                     Magistrates' Court (Code 2641 )

RAJA'S APARTMENT— Raided
011214
Aug 03

To each and all of the Constables of the Metropolitan Police Force
On this day application on oath was made by:

Detective Sergeant David Cooper

for the issue of a Warrant under: (specify enactment under which warrant is to
be issued)

s7(1) Criminal Justice (International Co-operation) Act 1993

and S8 Police and Criminal Evidence Act 1984

to enter and search the premises situated at (specify premises)

Flat 209 Quadrangle Tower, Cambridge Square,
London W2 2PT

and search for: (identify as far as possible, the articles or persons to be sought)

See attached, schedule

Government Sent
to GE
Full List What
was seized— and
in it Contract copy
was one of them —
I say send you the whole
GE

DISTRIBUTION

WHITE
Warrant to enter and
search premises

BLUE
Copy Warrant to be
left with occupant
or on the premises

PINK
Copy Warrant to be
retained by Police

EXECUTED 12 8 03    1758 12 8 03    Susan Kindon 8/05

COPY B

Authority is hereby given for any Constable, accompanied by such person
or persons as are necessary for the purposes of the search, to enter the said
premises on one occasion only within one month from the date of issue of this
Warrant and to search for the articles or persons in respect of which the above
application is made.

Date: 12th August 2003

And I certify that the copy Warrants marked A and B are true copies of this
Warrant.

District Judge EF.
Metropolitan Stipendiary Magistrate

Justice of the Peace for the Inner London Area

GOVERNMENT
EXHIBIT
J 243

M.C.A. 156
Warrant to enter
and
Search Premises
—
P.C.E. Act 1984
Sec. 15

12 noon.

FOR ENDORSEMENT TO BE MADE BY CONSTABLE EXECUTING WARRANT
SEE OVERLEAF

DIRECT EXAMINATION
BY MR. HOWE:

Q. Good afternoon, Cornel Olkhovskiy and Ms. Kuzmicka as well?

Who do you work for sir?

A. I worked for FSB Russia.

Q. What does the FSB stand for?

A. Federal Security Services of the Russian Federation.

Q. And is that similar too the FBI here in the United States?

A. Yes. This is a governmental agency which is involved in keeping security of the nation.

Q. What was your position at the FSB?

A. I am head of international illegal arms trade and arms smuggling.

Q. And what are your duties in that position?

A. My responsibility is to detect and prevent illegal arms deal, to stop the individuals who intend to purchase illegally arms. And then sell them out of Russia.

Q. How long have you been in charge of the illegal arms smuggling department?

A. Two years.

Q. And how many FSB officers approximately do you supervise?

A. Over 20 people.

Q. How long have you been involved in investigating illegal arms smuggling?

A. 13 years.

Q. And what other work have you done?

A. I am sorry?

Q. What other work have you done?

A. Before I was in charge of drug trafficking.

Q. And how many years have you been with the FSB?

A. 27.

Q. And was the FSB once known as the KGB?

A. Yes.

Q. Do you speak English, sir?

A. No.

Q. Did there come a time when the FSB learned of an individual named Hemant Lakhani?

A. Yes, I received an information from one of my informant in mid January of 2003.

Q. Was there anything that you learned about Mr. Lakhani at that time that concerned you?

A. Yes.

Q. Explain for the members of the jury what it was that concerned you?

A. First of all, the informant advised me that there was a contract signed in Kiev between Mr. Lakhani and a company in Cyprus named Laberia for the purchase of Igla missile.

And in order to conceal the subject of the contract due to real product that was to be purchased, the contract described the-- described it as a medical-- I am sorry, as agricultural equipment.

In addition to that, we found out that Mr. Lakhani gave the representative of Laberia company $2500 in order for him to help him find the missile on the territory of the Russian Federation.

Q. Did anyone at all connected with the United States government, notify the FSB about this information regarding Lakhani before the FSB learned of it on its own?

A. No.

Q. And based on what the FSB had learned independently of Lakhani's efforts did it start an investigation into Lakhani?

A. Yes. We-- we started investigate.

Q. As part of the FSB's investigation did it look into the company Laberia?

A. Yes.

Q. And what did the FSB learn about the Laberia company?

A. First of all we found out that Laberia company didn't have appropriate licenses in order to deal with arms. And from information obtained by us during the investigation that company was created specifically for that purpose; it was a front company.

Q. Did the FSB also look into the individuals that Lakhani was dealing with?

A. Yes. One of our tasks was to find out who Lakhani was dealing with in order to illegally purchase Igla missile on the territory of Russian Federation.

Q. Did you learn the names of any individuals affiliated with the Laberia company as far as that was concerned?

A. Yes.

Q. What were the names of those individuals?

A. We found out that there was Russian citizen name Sergey Pyatak and an Israeli citizen Waleri Gerner.

Q. Was the Laberia company related to Russian law enforcement in any way?

A. No.

Q. Was Sergey Pyatak working with Russian law enforcement in any way?

A. No.

Q. Was Waleri Gerner working with Russian law enforcement in any way?

A. No.

Q. But they were working with Lakhani, correct?

A. Yes.

Q. Based on what the FSB had learned, did it decide to infiltrate the missile deal?

A. Yes.

Q. Why?

A. We wanted to prevent, to stop Lakhani from acquiring the missiles from illegal sources. And that we would had lost sight of it.

Q. And at some point after the FSB started its investigation did it become aware of a separate American investigation in to Mr. Lakhani?

A. Yes.

Q. When was that?

A. On February 28, 2003, official representatives of-- representative of FBI in Moscow contacted us and made a request of-- for cooperation in order to investigate a British citizen named Lakhani. And that was a month and a half after we first found out about Mr. Lakhani.

Q. So after the Russian FSB and American FBI were aware of each other's investigations, did you folks coordinate your investigations from that point forward?

A. Yes.

Q. And for its part did the FSB introduce two undercover officers as part of the investigation?

A. Yes, two officers.

Q. Did you assign the officers yourself?

A. Yes.

Q. And what were the undercover roles that these two individuals were to play?

A. The officer using name Vladimir, his role was to be-- to introduce himself as a person who was able to find Igla missile under territorial Russian Federation. And at the same time he was to convince him that this was a very complicated issue. Because we talking about an illegal deal here.

And the other officer whose name Aleksey was introduced as an interpreter.

Q. Did these officers participate in recorded meetings with Mr. Lakhani in April and July of 2003?

A. During the first meeting on April 9 only Vladimir participated, I mean, the meeting with Mr. Lakhani. Vladimir and Aleksey participated in all of the remaining meetings, meaning April 10th and all the meetings in July.

Q. During every single one of these meetings did the defendant Hemant Lakhani express an interest in purchasing missiles?

A. Without any doubt. Even more so after a while he became very disappointed that it took that long, so much time to find that missile.

Q. And what port was the initial missile, I'll say that again.

At what port was the initial missile to be shipped from?

1/10

Government Exhibit
J-255
Contract No 30/12/1.
dated 30th Dec 2002

Mohammad Habib Rehman, [c.w] as a key witness was Not the choirboy witness any prosecution would want. Even a Retired Former D.E.A officer, MR. Charles Lee called him a crook, Liar and a dishonest individual. However, the Government contended that in a company of Thieves, The Russian Law officials [F.S.B - equivalent of FBI] i.e Col. Okholosky and Alexi Gololeiou, are the best they could do.

THE PROSECUTOR in their Quixotic quest to "Right" all "wrong" and To repair all imperfections through the WEB-of-LIES unethically coached their Two Russian witnesses to give False and materially damaging Testimony based and built on Government exhibit J-255 i.e. CONTRACT 30/12/1.

IN an effort To blooster the ^Government Theory that the CONTRACT [CONTRACT 30/12/1.] in fact is a CONTRACT signed by LAKHANI For THAT has, as "BLind" the Agricultural purchase, THAT He is hiding efforts To import Missile INTO United States of America and He is buying this Missile For and on behalf of Osama-bin-Laden and He would flying To Genova, Switzerland To obtain necessary Funds om an account held by AL-quida.

2/10

## Act I.

THE PROSECUTOR expressly claimed that This particular CONTRACT [ 30/12/1 ] They had Never seen it before until to-day - i.e. the 16th Feb 2005 - the day on which THE First Russian Witness Mr OKHOLOKYE Went on the " STAND " To Testify. They ( prosecutor) Further claimed that as soon as they received the copy of this document - They passed it over the SAME to the Defense Lawyer in the Court-room For his Review. [Trans No 127/32

THAN MR HOWE, Asst US Attorney in his direct Examination to his First Russian Witness MR. OKHOLUKII opened his very 1st dialogue asking his Witness :

QUOTE:      [ COURT- Transcript No  127 To 132 ]

Explain For the Members of the Jury what it was that concerned you - UNQUOTE

THE False dramA began To unfold directly From the Horses Mouth - FSB. Moscow - the official intelligence Agency - Moscow. He was on the stand For more than TWO½ Hours - There are in all Sixty Pages of court Transcript - [ VOLUME No 7 . p. No 7- 1370 onwards ] covering his Testimony - Surrounding story built around contract 30/12/5 In it, there is everything you can think of about Laichani's Terrorist associations, his relationship with bin-Laden - His Arms Trafficking activities - his connection with Sadam Hussain - List of the clients - all well known Terrorist organizations of the Globe - Signing of Contract in the Name of - "JOHN Smith"  preparation of invoice, Bill of Lading False declaration. With This Kind of Resumé  I should be classified as in the category of " CAPTURE OR KILL."

3/10

## Act - II

The Next day - 17th Feb. 05, The 2nd Russian witness i.e. ALEXIE Gololoiv took the stand For the full day. [ This court transcripts runs more then 150 pages - volume No 7  P. No... 1404 onwards. ]

The "storyline" - identical like his Boss - [Col. okhlosiki,] but with much added curry flavour and misinterpretations but in greater details, that could influence of the "cover up" on the part of F.B.I, but leave an impression that F.S.B (Moscow) were acting on their own. Finally, my own Lawyer managed to get a certificate from him that Lakhani did speak about " Bin-Laden " [see attached Transcript] and the Jury was " Excused " and asked by the Judge To Retire for this day and went Home with humming sound - of Bin-Laden, Lakhani's Arras-Trafficking, False contract, Terrorist Association - a villain, an Anti-American, and of course, Missile "Igla" Laying in the Court-Room.

## Impact on my Trial

For Two Full days, Jurors sitting in the Box under the shadow of " Twin-Towers ", listening Two Russian's [ F.S.B ] all day along about alleged contract and you put " Osama-bin-Laden " in the courtroom and ask the Jury To ignore it - " You are asking a lot " - whetherit is factual or emotional. You have to leave it to the Jury. It is a strategic Tool any prosecutor would use in a Criminal Trial in which defendant is charged with attempting to provide material support to Terrorist, to the extent that you can mention the name " Osama-bin-Laden the " Heinousness is impacted dramatically.

4/10

## CRIMINAL - INTENT.
### PROSECUTORIAL MISCONDUCT.

1) PROSECUTOR KNOWINGLY eLicited false TESTIMONY FROM thEIR TWO CRUCIAL RUSSIAN WITNESS.

2) PROSECUTOR Falsely PRESENTED at the Trial GOVERNMENT EXHIBIT No. J-255 ( alleged CONTRACT 30/12/(1.) KNOWING it To be UNTRUE

3) MADE a false STATEMENT THAT the said COPY OF the CONTRACT was delivered To the GovernmEnt by esl. OKludaxx before He WENT on the STAND To Testify ON 16th Feb 2005

4) GOVERNMENT Lied and Tolerated LiES and allowed the JURY To Hear inflammtory, False and materially damaging Testimony that preJudiced THE defendant?

5) THEIR ( F.S.B) Testimony, besidES being FLawed and False, unfounded and FABRicated was Far " OuTweighed " by unFaiR preJudicE

6) GOVERNMENT CoNTiNeously attempted, ( with great deal of success) to eLicit their Testimony THAT WENT Well beyond the scope of it's success.

7) THE MESSAGE that ~~IssER~~ KLingman. [ buddy of PROSECUTORS] [NEWARK] was sending OUT WHICH was Loud and cleAR — " DoN't WORRY about LISING False Evidence — You will only get an admonition, if you are stupid enough To admit it