1/4

dt. 12th April.012

FROM: H Lakhani. esq.

Reg: 257530-50

H. C. F. P

4000 - Springfield,

M.O. 65801

CONFidential

Recorded-Delivery

TO: Michael F Rivera,

In- Court Supervisor,

United states District Court,

District of New Jersey

Newark- NJ 07101 0419

RECEIVED

MAY 03 2012

AT 8:30_____M

WILLIAM T. WALSH, CLERK

Re: U.S.A. v. Lakhani, Crm. 03-880 (KSH)

Docket Text: Order denying (111)

Motion for disclosure- 28th Feb. 012

DEAR MR Rivera;

Further to my earlier letter dated 9th Mar.2012, in connection with above captioned matter I respectfully beg to draw the attention of your court in Light of the following Facts:

Defendant Lakhani's PRe- Trial Motion filed on 12th March 04, which was heard on 26th April. 04.

In Response, Government also filed PRe-Trial Motion in support of United states's Cross- Motion, in opposition, to the defendant's pre-Trial Motion

2|4

Giglio- Material [ PAGE NO 30]

In it, the Government advised that:
the AFTOR "Brady"- the supreme court expanded its
disclosure Rule to include the 2nd category i.g
"Evidence which may be used to discredit the Testimony
of critical Government witness such that it is
reasonably likely to change the Jury's Judgement"
          Subsequently Government in its letter
dated 28th Rec. 04 [ the 'so called non-court filing
document] advised and confirmed that as per Ms.
Cynthia Mcgauth's memo, dated 25th July 2001, she
closed C.W as non "Asset" due to Relocation in New
Jersey. she [ mcgauth] further testified at the Trial
that, although she briefly Re-opened C.W 2nd Time on
or about 9/11, 2001, but again she closed him for
good at the end of sept. 2001, when C.W. finally
moved to New-Jersey with his family.[
          Ironically, at the Toral during C.W's
cross-examination" on 15th Feb 2005, — C.W Testified
under oath that to meet Lakhani for the first Time,
on 17th Jan. 2002, He flew in Newark Airport, N.J.—
for which the Government re-imbursed Him the FARes
and expenses, which is reflected by the Government in its
letter A 28th Dec 2004. [ see attached Transcript no P. 7 to 12]
          To date, Defense has been able to
obtained, the date, the flight details, the arrival schedule
at New-ark Airport and ofcourse the origin of his
boarding his flight for New-ark

Besides the above proof, I Have also obtained from the appropriate Telephone Company, the Telephone Number from which He phoned me on the 19th Dec. 2001 at my Home in London - UK, - the First over recorded conversation - item NO----    While this meeting was in progress at first suit, c.w. also made a statement [ duly recorded] that He specially flew in from his Country House in Mid-west For this meeting.

Heretofo, Government has claimed and Rested it's case on premises that c.w.'s "Re-Location" Took place in Newark on or about the 1st week in October 01, and based on this presumption - the Two F.B.I. officers [ TARREO and McGaush] the Team of the Prosecutor [ Howe and Rabnar] and Klingman [ The dishonorable and disloyal defense c.J.A. Counsel] all have consistantly and repeatedly Mis-prosated and Mis-informed the Jury and the Judge, which affected their rational Judgement about the case.

Deliberate false statement by those privileged to represent the United States has HARMED My Trial process and the integrity of our prosecutorial system. The court should Not Lightly Tolerate a prosecutor asserting as a fact to the Jury, something Knowing it to be UNTRUE — This is a very serious matter, and must be dealt with as per the Law of the Land [ i.e Lying to the Grand Jury - An Act of Perjury to Conspire to Commit obstruction to the Justice []

4/4

## C.J.A. Funds - expended on Expert Translation Services:

The court records shows that Klingman did't spend a dime on this important expert translation service — i.e. Recorded conversation in Moscow Russian into english — which was vital for the defense - but rather relied on the Govt. translator - McOaul - instead of challenging the Government witness. i.e. FSB Moscow [ Col Okholvsky and Alexis ] - To the contrary, He became an active participant in hiding away -: "The Binder" - [ i.e. the Russian volume - translated in English] along with Government - while the Jurror's were decrying and screaming for this Binder — . For their review: These facts is well documented in my earlier communication. [ see chart ]

To the contrary, in order to show his false Bona-fide, Klingman made a public statement to the Star Ledger Journalist that he intend to spend and challenge the Government on Translation accuracy - of Russian/english - Transcription [ in short ] Klingmon falsely and deceitfully obtained CJA Funds [ Tax payer's dollars ] under the false pretence by making public statement [ see attached paper clipping] The same is applicable to Hindi/english version-Tapes. This is a serious matter, & must be investigated as He has pocketed the Taxpayer's dollar — . Thancing you — I remain, Telokhani.

Copy for V,) Currence Committee — Connecticut — the Allot Chairman
V,1 Public Interesty Section, Dr Q Justice Dept.

Q. Mr. Tareco gave it to you this morning?
A. Yes, sir.
Q. To the best of your recollection, does it appear to be an accurate list of the payments that you received?
A. Yes. This is my estimation.
Q. If I would take a look at it again please.
A. Yes (handing).
Q. Okay. So as we said in 2001, you got 17,500 from FBI?
A. Yes, sir.
Q. And 4,500 from the DEA?
A. Yes, sir.
Q. And the document D 3 that you have handed me showed in 2002, you got $55,000 from FBI, not including expenses?
A. Yes, sir.
Q. And during that same period from DEA 2002, you got $7,500?
A. Yes, sir.
Q. Again not including expenses?
A. Yes, sir.
Q. For 2003 you got $68,000 from FBI, not including expenses?
A. Yes, sir.
Q. And from DEA, during that period, $3,000?
A. Yes, sir.
Q. And finally in 2004, the year we have just finished, you got paid only by FBI, correct?
A. Yes, sir.
Q. Not by DEA?
A. Yes, sir.
Q. And the figure from FBI, not including expenses is $72,000?
A. Yes, sir.
Q. Expenses, does include things like the cost of travel?
A. Yes, sir.
Q. Things that you have to pay for in connection with your work as an informant, correct?
A. Yes, sir.
Q. Could you give us some more examples of the expenses that you have incurred?
A. Staying in the hotel. Traveling, most of the time staying, traveling and rent.
Q. Rent?
A. Hotel rent.
Q. Hotel rent?
A. Yes.
Q. So for example, when you came here in January 2002 to meet with Mr. Lakhani for the first time in the Newark area, you had to travel here from some other part of the United States?
A. Yes, sir.

Q. Did you fly here?
A. Yes, sir.
Q. Who originally paid for that ticket?
A. In the beginning I paid and then they reimbursed to me.
Q. That would be the kind of expense that you would incur?
A. Yes, sir.
Q. Now, at the very end of our section on Thursday you told us that one of the members of your family needed some medical attention at the beginning of last year?
A. Yes, sir.
Q. And that person, that member of your family got the medical attention from a hospital?
A. Yes, sir.
Q. And you have not paid for that medical attention?
A. I have started paying it. When he was admitted at that time, I had deposited some money at that time.
Q. Well, you told us that you had applied for insurance shortly before the medical attention was administered? Yes?
A. Yes, sir.
Q. But you weren't able to obtain those insurance benefits after all?
A. Yes, sir.
Q. Because the insurance company determined that you had lied during the application process?
A. Yes, sir.

Q. Okay. When was this medical attention administered? When was this hospitalization?
A. April 2004.
Q. And how much was the medical attention? How much were the hospital bills?
A. According to the letters sent by the hospital, it was 500,000-- 504,000.
Q. Now since that time you have reached an agreement with the hospital to pay just $25,000, right?
A. Yes, sir.
Q. So you wouldn't have to pay the 500 and-- $479,000\ balance in the future?
A. Yes, sir.
Q. When did you reach this agreement with the hospital?
A. After they send me a bill, since that time for two months I have been trying to find out about the total amount of the bill.
Q. When were those two months? The last two months?
A. Yes, sir.
Q. So we are in February now. It's February 15 I believe. And would you say your discussions with the hospital began in December 2, 2004?
A. Yes, sir.
Q. So approximately three weeks before you began to testify in this case?
A. Yes, sir.
Q. Now did you start having these discussions with the hospital before or after the FBI asked you about the insurance policy lie that you had told?
A. After that.
Q. So after the FBI came to you and asked you about the insurance application, you began to have discussions about with the hospital about the debt that you owed?
A. Yes, sir.
Q. Now, were you the defendant in a lawsuit filed in the state of Minnesota? Oriental Imports Inc. against Muhammad Habib Rehman, defendant?
A. Yes, sir.
Q. As a result of that lawsuit, did a Minnesota state court impose a judgment against you in the amount of $46,160.29?
A. Yes, sir.
Q. Have you paid that money?
A. No, sir.
Q. Was that judgment imposed in October 2003?
A. Yes, sir.
Q. In August of 2002, during the investigation of this case, approximately a year prior Mr. Lakhani's arrest, did you accept $30,000 from a New York businessman towards the purchase of rice?
A. Received for the purchase of?

Q. The time period I'm talking about is August 2002, one year before Mr. Lakhani's arrest?
A. Yes, sir.
Q. During that time period, did a New York businessman, a businessman located in New York, invest with you or give you $30,000 for the purchase of rice?
A. Yes, sir.
Q. And after you ordered the rice, the businessman changed his mind and requested his money back, correct?
A. Yes, sir.
Q. And you have sold part of the rice that you purchased with that $30,000, correct?
A. Yes, sir.
Q. How much have you paid the businessman back for his $30,000 investment?
A. 2,500.
Q. So you still owe him $27,500?
A. Yes, sir.
Q. Okay. Now in 2002, were you a defendant in a lawsuit filed in the state of Minnesota entitled Mecca, spelled MCCA, Meat and Grocery against Muhammad Habib ur Rehman, also known as Muhammad Habib Rehman and House of Rice Inc., a Wisconsin corporation, defendants?
A. Yes, sir.
Q. And on March 5, 2002, did the court in Minnesota impose

P NO 12 · DEFENSE— Never Tried to find out the NAME of this man — Nor He Subponead him To TESTIFY — I told him several Times —

Financier — For 30,000 dollar.

Government should disclose the name and the details of the Financier and the details of this Transaction—

Repeatedly I have asked both Klingman and the Government to provide those details but without response. It seems, Govt has invented this episode to create a false impression that C.W. did more to N.J. after the end of Sept 01— and since this is the nearest proximity to N.J. This equation sounds plausible. I can challenge that this is a Bogus Example — The court ask for more details?

"I'm sorry," he said, according to one agent's report. "You know everything." He told them he was "a fool" driven by greed.

That afternoon, agents raided Abraham's office and arrested him and a third man, Moinuddeen Ahmed Hameed, who was waiting to witness the money transfer. Prosecutors later said neither man was aware the transaction involved missiles. Both have agreed to plead guilty to charges over the illegal money transfer.

Vijay Raja, Lakhani's contact in London, also is cooperating with agents there.

Last month, the judge in Lakhani's case ruled that he was no longer able to afford a private attorney and approved court funding for his defense. Klingeman, his defense attorney, said he plans to use some of the money to hire an independent expert to challenge the translations of the taped conversations.

He also has asked U.S. District Court Judge Katharine Hayden to compel the government to identify its cooperating witness and turn over information about his background. In motions filed late Friday, prosecutors argued that they should not have to reveal the information until the week before the trial.

Hayden has scheduled an April 26 hearing for arguments in the case.

A trial is not likely to occur until the fall.

*John P. Martin may be reached at (973) 622-3405 or at jmartin@starledger.com. Researcher Christine Baird contributed to this report.*

Copyright 2004 NJ.com. All Rights Reserved.

Klingman is a liar and a criminal — I can't understand why your court is "shielding" him. ?

## How THE JURY WAS "FOOLED"

### Recording And Transcripts

That Took place in Moscow:

### Juror's Raised Question.

" WHY HAVE't THE JUROR SEEN THE TRANSCRIPTS"
THAT TOOK place in RUSSIA IN PRINT FOR THEIR "REVIEW"

THE COURT: asked prosecutors -.
" How do you WANT ME TO ANSWER"
"WHO-said-WHAT." Volume No. 7.

THE LEAD prosecutor - RABNAR ......... To Judge.
" IN VIEW OF THIS, YOUR HON, PERHAPS YOU
could say THAT YOUR HON, you will be getting
all of these TRANSCRIPTS And "HANGIN THERE" [P.No 1408]

THE COURT: - . TO JURORS
" Quick ANSWER "You will" It is coming up
BUT through a different WITNESS [P.NO. A1411]

THE A.U.S.A-. HOWE: - . DIRECT EXAMINATION - ANOTHER WITNESS.
OFFICER: ALEXIE GOLOVLEV. Agent_ F.S.B
And all of THE TAPES, and the corresponding
TRANSCRIPTS of Course will be available in their entirety
For the MEMBERS OF THE JURY" [ P.NO A 1443]
KLINGMAN [defense] ......... To Judge:
" I completely agree with this Response that
THE JURY iN Good TIME they will get the 'TRANSCRIPTS
and be waiting to Review THEM" [ P.No A1406]
THE bottom LINE: JUROR NEVER saw the "TRANSCRIPT in print